**KEENE CORPORATION, Plaintiff,**

v.

**William J. HOOFE, III, Defendant.**

Court of Chancery of Delaware, New Castle.

May 28, 1970.

Hugh L. Corroon, of Potter, Anderson & Corroon, Wilmington, for plaintiff.

Rodman Ward, Jr., of Prickett, Ward, Burt & Sanders, Wilmington, for defendant.

MARVEL, Vice Chancellor:

The complaint herein seeks to have set aside a transaction in which four thousand shares of plaintiff's common stock were issued to defendant upon payment by the lat-

ter of the sum of $33,000 following his entry into plaintiff's employ and his execution of a stock option agreement governing his acquisition of such shares. Under the terms of § 10(a) of the plan (on the basis of which options for plaintiff's shares are issued), sale of such shares by an optionee to any buyer other than plaintiff is severely restricted during the first five years of an optionee's employment.

According to the complaint, defendant has refused to surrender all of his optioned shares upon termination of his employment of less than one year as required by the plan, the relief sought by plaintiff being based on its alleged right, under stipulated conditions concerned with length of employment, to repurchase, at the option price, all or part of such stock as provided for by the terms of § 10(b) of plaintiff's stock option plan.[1] Plaintiff's prayers are that the stock certificate for 4,000 shares of Keene stock issued to defendant be cancelled, or, in the alternative, that defendant be ordered to execute and deliver to plaintiff a stock power authorizing the transfer of such shares upon repayment of the $33,000 which defendant originally paid to acquire the securities in question.

Mr. Hoofe entered plaintiff's employ on May 27, 1968 and was discharged from such employment on January 6, 1969. Prior to such employment he had worked for the B. F. Goodrich Company in Akron, Ohio, as a marketing manager. In December, 1967, Goodrich discontinued the de-

partment in which Mr. Hoofe had been employed, and he thereupon became self-employed as a management consultant until employed by plaintiff. Meanwhile, he continued to look for industrial employment. On April 16, 1968, Mr. Hoofe was interviewed in New York by Mr. Megary of the firm of Buttrick and Megary, an employment agency acting for plaintiff, concerning efforts being made by plaintiff to secure the services of a marketing vice president for its Penn Metal division located at Parkersburg, West Virginia. During such interview Mr. Hoofe was shown a so-called position description about the job, drafted by Mr. McCarthy, a vice president of Keene and approved, after slight modifications, by Mr. McKeown, president of plaintiff's Penn Metal division. Such paper outlined the nature of the business in which Penn Metal was engaged, the role therein of the employee sought, and the hoped for characteristics of the man plaintiff was looking for to fill such position. A specific salary was not offered, the probable salary to be expected being represented to be around $20,000.

On April 22, 1968, Mr. Hoofe met with Mr. McKeown in Parkersburg, and a few days later continued conversations about his prospective employment with Mr. McKeown and Mr. McCarthy at the dining room of the Newark, New Jersey airport. On April 29, 1968, Mr. Hoofe, in a telephone conversation with Mr. McKeown, accepted employment at plaintiff's plant. Mr. McKeown followed up such conversa-

---

1. Section 10(b) provides:

"(b) If the Optionee was an Employee at the time the Option was granted, then if the Optionee's employment by Keene terminates before the first day of the sixth year following the Option Date, then Keene shall have the right to purchase at the Option Price any stock which is still restricted under Section 10(a). Keene may exercise such right within thirty (30) days after the date of such termination. If this right is not exercised within such thirty (30) day period, Keene agrees that all such stock becomes automatically free of the restric-

tions contained in Section 10(a) and further agrees to issue stock certificates free of any such restrictive legend as required by Section 10(a)."

However, this section must be read in conjunction with § 10(a) of the Plan, which, as noted above, prohibits an employee from selling optioned stock before first offering it to plaintiff on a graduated basis which does not free all stock from such restriction until five years of employment has been completed. No stock is to become unrestricted until a year has elapsed from the option date.

tion by a formal letter of the same date[2] acknowledging defendant's acceptance of the job. Defendant confirmed his oral acceptance by a telegram,[3] dated May 1, in which he expressed his interest in assisting in substantially increasing Penn Metal's sales volume and profit. As noted above, defendant began work for plaintiff on May 27, 1968, and was discharged on January 6, 1969. Such employment was for an indeterminate term, and defendant concedes that plaintiff had a right to discharge him with or without cause.

In setting about finding a qualified marketing vice president for its Parkersburg plant, plaintiff's responsible officers were apparently fully aware of the fact that in order to procure the services of a qualified person for the position to be filled who would be willing to move to Parkersburg, an apparently geographically undesirable location, that the emoluments of the job must be made attractive, and the so-called position description prepared by Messrs. McCarthy and McKeown and forwarded to Mr. Megary for use in soliciting job candidates stated in part as follows:

> "Probable salary around $20,000—BUT abnormal bonus if he can really produce $10–$15,000 (in 1969; $5–$10,000 in 1968), 4,000 shares stock option *at ⅓ of market price*. Almost all fringes, but if he's substantially interested in fringes, we're not interested."

This job description held out to defendant, in the event of entering defendant's employ, the possibility of a higher salary than he had received in the past, the chance to earn a large bonus based on accomplishment, and a valuable stock option. Defendant contends that the three forms of compensation referred to in the position description paper constituted actionable representations on plaintiff's part which induced him to work for plaintiff, and there is no doubt but that it was the existence of such incentives which persuaded Hoofe, reasonably or not, to move his family from Akron, Ohio to Parkersburg, a place in which he was not keen to live. The stock option proposal was particularly attractive in that stock so acquired could be purchased for not more than one third of the then market price, and, as it turned out for defendant, less. Significantly, in the course of conversations concerning the job, which he ultimately accepted, defendant resisted Mr. McCarthy's suggestion, arising out of the then inflated market price of the stock, that he subscribe for 2,000 or 3,000 shares instead of 4,000.

Defendant contends that at no time prior to his actual employment did plaintiff's representatives mention the restrictive buy-back provision contained in section 10(b) of the option plan in the event of premature termination of employment of an optionee and that he was accordingly wrongfully induced or induced without legal effect into accepting employment with plaintiff. And it is true that no mention of the restricted nature of the stock to be optioned or plaintiff's right to repurchase such stock, under certain conditions, was made in the position description paper on which defendant relies. He argues therefor that Keene should not be permitted at this point to rely on such repurchase provision and thereby benefit from its own alleged misrepresentations. Keene argues, on the contrary, that Mr. Hoofe accepted and became bound by the terms of the stock option plan when early in July he ex-

---

2. This letter signed by Mr. McKeown stated " * * * I am pleased that you have accepted the position of Vice President, Marketing. The position carries with it a salary of $20,000 per year * * * " and went on to note that defendant would participate in a profit sharing program and receive " * * * an option for 4,000 shares of Keene stock according to the Keene Stock Option Plan. (Subject to the approval of the Keene Stock Option Plan Committee)."

3. "This will confirm our April 29th telephone conversation during which I accepted your offer to join Keene Penn Metal Div. * * * "

ercised his right to acquire stock by signing an option agreement in which he represented that he was familiar with the terms and provisions of the option plan although he claims to have not received a copy thereof until the last week of July or the first few days of August.

By way of counterclaim, Mr. Hoofe further charges that authorized officers of plaintiff represented to him that he would share in the company's bonus plan for 1968, that no such bonus was paid to him and that he is therefor entitled to damages. He goes on to claim that following his release from plaintiff's employ the shares issued to him became free of restriction under the terms of plaintiff's stock option plan by reason of plaintiff's failure to purchase such shares within thirty days after the date of defendant's termination of employment by plaintiff and that as a result of plaintiff's action in filing this action and refusing to allow such shares to be freely transferred defendant has been damaged by the consequent market loss in the value of such shares in the sum of $48,000.

Both plaintiff and defendant, being of the opinion that the basic issues before the Court are legal and that there are no genuine issues as to any material facts, have moved for summary judgment. This is the opinion of the Court on such motions.

In exercising his stock option, Mr. Hoofe in early July, 1968, executed an undated stock option agreement which had already been signed by an authorized officer of plaintiff, bearing an option date of June 21, 1968, which provided, inter alia, that he was to receive an option with a five year term to purchase 4,000 shares of Keene common stock at a price of $8.25 per share for 25% of such stock's market value, and further that such option was to be subject to the terms of the stock option plan. The fourth paragraph of such agreement reads:

"4. Optionee acknowledges receipt of a copy of the Plan and represents that he is familiar with the terms and provisions thereof, and hereby accepts this option subject to all of the terms and provisions of the Plan and of this Option Agreement."

On June 28, plaintiff's president and chairman had written defendant that plaintiff's stock option committee had voted to offer defendant a stock option for 4,000 shares " * * * as set forth in the attached Stock Option Agreement subject, of course, to your acceptance of such agreement."

On July 19, 1968, Mr. Hoofe wrote plaintiff a letter in which he stated:

"Pursuant to the terms of the Stock Option Agreement granting the undersigned a stock option for 4,000 shares of Keene Common Stock on June 21, 1968, at the option price per share of $8.25, I enclose my check in the total amount of $33,000."

Defendant's basic contention in support of his claimed right to retain his 4,000 shares of Keene Common Stock appears to be that he claims to have been unfairly induced to accept employment by plaintiff by responding to his detriment to the alleged offers contained in the position description above referred to as a result of which he made various commitments which he would not otherwise have made, particularly that of moving his family to the Parkersburg area and buying a house in a nearby city. He contends, accordingly, that plaintiff must be required to live up to the results of his acceptance of the offers made in such position description.

I am satisfied, however, that the position taken by defendant in regard to his alleged response to the position description in issue is one which is tenable only in the case of published offers of rewards and the like in which a specific offer is followed by an unequivocable acceptance and that in the present situation the paper relied on by defendant as an offer was merely an invitation either to make a firm offer or to enter into negotiations concerning possible

terms of future employment. Compare Salisbury v. Credit Service, 9 W.W.Harr. 377, 199 A. 674. Accordingly, I conclude that the respective contentions of the parties must be resolved on the basis of what they formally agreed on following the preliminary discussions which ensued after disclosure to defendant of the so-called position description of the job sought to be filled by plaintiff, considered in the light of steps taken by defendant to his detriment, in good faith and in the exercise of due diligence, in reliance on plaintiff's verbal inducements or actions, Vol. 3, Pomeroy's Equity Jurisprudence (5th Ed.) § 805 et seq.

■ Turning then to the pending cross motions for summary judgment, it is immediately apparent that there are wide factual inconsistencies in the pre-trial testimony of plaintiff's agents as opposed to that of defendant concerning discussions which led up to the making of the employment contract of April 29, 1968, as well as testimony having to do with conversations leading up to the issuance to defendant of 4,000 shares of Keene common stock after he became an employee of plaintiff's. However, I am of the opinion, because the parol evidence rule is a principle of substantive law which I believe must apply here and because there is no proper showing of fraud or over-reaching on plaintiff's part, the factual differences apparent on the present record do not, in my opinion, militate against disposal of that part of this case which is concerned with the Keene stock issued to defendant on the pending motions for summary judgment, Dale v. Smith, 1 Del.Ch. 1; Equitable Trust Co. v. Gallagher, 31 Del.Ch. 88, 67 A.2d 50, aff'd 32 Del. Ch. 401, 77 A.2d 548; Morton v. Morton, 36 Del.Ch. 407, 131 A.2d 185, and 30 Am. Jur.2d Evidence § 1016. Compare Carey v. Shellburne, Inc. (Sup.Ct.Del.) 224 A.2d 400.

In any event, were it not entirely clear that the parole evidence rule is applicable here, to allow the Keene stock in defendant's possession to be retained by him would, to all intents and purposes, constitute approval of an unauthorized gift of corporate assets. In other words, acceptance of the theory on which defendant states his claim, namely that he has acquired such stock free and clear of any encumbrance, ignores conditions designed by the directors of Keene to assure that the issuing corporation might expect to receive the benefits contemplated to be received from the grant of options, Beard v. Elster, 39 Del.Ch. 153, 160 A.2d 731, and cases therein cited. The terms of §§ 10(a) and 10(b) of the plan are clearly drawn so as to encourage long term employment, and " * * * to advance the growth and prosperity of Keene Corporation by attracting and retaining the best available personnel * * *", § 1, Keene Corporation stock option plan.

Defendant contends, however, that because he changed position in reliance on what he conceived to be plaintiff's actionable overtures as to a fixed salary, an assured bonus in a fixed minimum amount and the offer of an unrestricted stock option, by buying a house near plaintiff's factory, by borrowing $33,000 in order to exercise his stock option, and in general disrupting his family's life and roots in Ohio, that plaintiff is estopped to rely on the terms of its option plan.

It is stated in Vol. 3 Pomeroy's Equity Jurisprudence § 813:

"Since the whole doctrine (equitable estoppel) is a creature of equity and governed by equitable principles, it necessarily follows that the party who claims the benefit of an estoppel must not only have been free from fraud in the transaction, but must have acted with good faith and reasonable diligence; otherwise no equity will arise in his favor."

■ I am satisfied on the basis of the material undisputed facts of record, considered in light of the parole evidence rule, that defendant, in entering plaintiff's em-

ploy on the express terms hereinabove alluded to, and in agreeing in writing to accept a stock option " * * * subject to all of the limitations and restrictions contained in the Plan * * * ", while allegedly relying to his detriment. on inducements to negotiate on terms of employment, did not act with reasonable diligence. Accordingly, cases on equitable estoppel, such as Rivas & Rivas, Inc. v. River Road Swimming Club, 40 Del.Ch. 249, 180 A.2d 282, and Wolf v. Globe Liquor Company, 34 Del.Ch. 312, 103 A.2d 774, do not help defendant's cause in light of the Court's ruling on the applicability of the parole evidence rule.

Next, defendant contends that plaintiff's letter of January 17, 1968 concerning plaintiff's desire to repurchase defendant's shares of Keene stock was not an effective exercise of plaintiff's right to reacquire such shares under the terms of § 10(b) of the option plan. The letter reads as follows: .

"Please sign the enclosed stock power and return it to us along with the certificate and we will forward the money to you—or to the bank you designate. Don't date the power; simply sign it."

■ Read in the light of the papers which control the parties' respective obligations concerning the 4,000 shares of stock here involved, I find nothing ambiguous in the terms of such letter in view of defendant's actual or constructive knowledge of the terms of the option plan, particularly §§ 10(a) and 10(b), subject to the terms of which defendant acquired the shares in dispute.

■ Defendant goes on to contend that in any event inasmuch as the attempt to recapture defendant's Keene shares was not the act of the committee, set up in § 12 of the plan to administer it, such effort was abortive. However, I am satisfied that §§ 10(a) and 10(b) of the plan, which have to do with restrictions on the selling of stock by optionees and the right to re-

purchase shares within thirty days after an employee's job at Keene is terminated, refer solely to the corporation's rights to protect its interest in such shares in the event they have not become fully free of restriction as a result of an optionee's completion of five years of labour for the corporation. § 12 of the plan, on the other hand, has to do with implementing the issuance of options under the plan by a disinterested committee, whose duties consist of selecting qualified optionees, determining the times when options shall be granted, as well as the number of shares to be optioned. These actions require the exercise of discretionary powers whereas the reacquisition of Keene shares from employees, who have worked less than five years, is a virtually automatic procedure which is spelled out in detail in the plan. Accordingly, defendant's 4,000 shares of Keene stock not having become unrestricted to any extent as a result of his labours must be cancelled inasmuch as he worked for Keene for less than a year. It necessarily follows that defendant's counterclaim based on the depreciation in the value of Keene shares held by him under restriction during the pendency of this action must be dismissed. Next, I am satisfied that because defendant acted without reasonable diligence and because plaintiff, in employing defendant and issuing him option, did not actionably mislead him, his contentions concerning unclean hands and reformation are not in point.

Defendant also counterclaims for a bonus or interest in a profit sharing plan although he admittedly did receive three months' termination pay of $5,284.86 after working for plaintiff for approximately seven months.

■ Insofar as this claim is concerned I do not think summary judgment is appropriate in that it is not clear on the present record exactly what were the terms of the alleged arrangement on which plaintiff sues. It is also not clear whether defendant was discharged from employment with cause or without cause, a factor which may

affect his claimed right to such form of compensation. These facts and others concerning such counterclaim must therefor be tried.

On notice, an order granting plaintiff's motion for summary judgment cancelling the 4,000 shares of Keene stock registered in defendant's name upon return to him of the purchase price and dismissing defendant's cross motion and counterclaim as to his claimed interest in such shares will be denied. The cross motions concerning defendant's counterclaim for a bonus, and/or share of profits will be denied.