**JOHN G. LAMBROS CO., INC., Plaintiff,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Defendant.**

No. 78 Civ. 2987.

United States District Court,
S. D. New York.

March 28, 1979.

S. Robert Lee, New York City, for plaintiff.

Hendler & Murray, New York City, for defendant; Monroe Weiss, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, John G. Lambros Co., Inc., an insurance broker, commenced this action against defendant, Aetna Casualty and Surety Company ("Aetna"), to recover the sum of $85,000 allegedly due plaintiff from Capay Painting Corp. ("Capay") and Town Hall Contracting Corp. ("Town Hall"). The defendant moves to dismiss the complaint pursuant to Rule 12(b)(6) & (c) of the Federal Rules of Civil Procedure and has submitted an affidavit in support of the motion; plaintiff has submitted an opposing affidavit. Accordingly, the motion is treated as one for summary judgment pursuant to Rule 56.[1]

The essence of the complaint, after alleging that Capay and Town Hall are indebted to plaintiff for unpaid brokerage fees, is that defendant "took over," "asserted control over," and "converted" the business and assets of Capay and Town Hall to its own use and to the detriment of plaintiff and other creditors of Capay and Town Hall, and that by reason thereof the defendant is "guilty of fraudulent conduct." These conclusory allegations must be considered against established facts.

Commencing in May 1975, Aetna issued surety bonds guaranteeing performance and payment by Capay and Town Hall which were contractors on various construction projects. A majority of the bonds are Miller Act bonds in favor of the United States of America. To secure these surety bonds, Capay, Town Hall and others entered into indemnity agreements in May 1975 and again in June 1977 whereby they agreed to indemnify Aetna against any loss and to deposit with Aetna on demand the amount of any reserve against such loss which Aetna deemed it prudent to establish.

In late 1977 or early 1978, Capay and Town Hall experienced financial difficulties in meeting their payments to employees, materialmen and other job creditors on various construction contracts with the United States. In addition, they were indebted to Bankers Trust Company, a secured creditor of both companies, in the aggregate sum of $342,500 together with accrued and accru-

---

1. Fed.R.Civ.P. 12(b); see Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 392–93 (6th Cir. 1975); Cook v. Hirschberg, 258 F.2d 56, 57–58 (2d Cir. 1958). The affidavit of John G. Lambros, submitted in opposition to the motion, enlarges upon the allegations contained in the complaint. Subsequent to oral argument on the motion, plaintiff submitted additional material to the Court—a copy of a state court judgment obtained by plaintiff on January 10, 1979 against Capay and Town Hall.

ing interest.[2] Capay was declared in default on various jobs on which Aetna as surety was obligated under its Miller Act bonds; thereupon Aetna arranged for completion of the defaulted jobs.

In March 1978, Aetna and Bankers Trust Company entered into a financing agreement with Capay, Town Hall, Bay Equipment Corp. and Nicholas G. Capous, president of Capay and Town Hall (the "indemnitors"), to provide funds for Capay and Town Hall in order to enable them to complete items of work then outstanding and not yet in default and to pay labor, materialmen and other job creditors. The estimated cost to complete work on projects bonded by Aetna was in the approximate sum of $2,500,000 and an additional $90,000 was required to complete work on unbonded jobs. Aetna agreed to advance such sums as were necessary to (1) complete each of its bonded projects, (2) pay the creditors covered by the bonds on such projects and (3) defray general and administrative expenses of Capay and Town Hall, which were required to complete all existing bonded and unbonded projects.

The indemnitors reaffirmed their obligations under the indemnity agreements of May 1975 and June 1977 referred to above. They further confirmed their earlier assignments to Aetna of all their rights in the construction contracts, including all monies due thereunder or to become due. While the earlier indemnity agreements did not explicitly use the term "assignment,"[3] it is clear that not only was this the contemplation of the provision, but that if Capay and Town Hall were to default on the contracts, which Capay had as to a number of jobs, and if Aetna as surety were required to perform under the payment and performance bonds, as it had been, then under the doctrine of equitable subrogation Aetna would be entitled to all payments under the contracts, including those earned but not yet paid over at the time of the contractors' default. Aetna's right would be good even as against a perfected security interest.[4]

Since a number of the contracts on which Aetna agreed to advance funds pursuant to the financing agreement of March 1978 were unbonded, or, if bonded, had not yet been declared in default, and because the agreement contemplated the advancement of funds in excess of receipts under the government contracts, Aetna obtained the additional protections afforded a secured creditor under the Uniform Commercial Code.[5] Aetna, as agent for itself and the Bank, received a security interest in all contract rights of Capay and Town Hall, all personal property and proceeds thereof, and mortgages on real property owned by Capous. In addition, Capay, Town Hall and Bay Equipment Corp. pledged and assigned to Aetna and the Bank all the stock of the

---

**2.** The Bank's interest was secured by certain equipment being used by Capay and Town Hall to complete various projects.

**3.** The only reference to an assignment appears in the following provision of the indemnity agreement:

4. The validity and effect of this General Contract of Indemnity shall not be impaired by, Aetna shall incur no liability on account of, and the Indemnitors need not be notified of:

(c) The taking, failing to take, or release of security, collateral, assignment, indemnity agreements and the like, as to any Bond.

**4.** *National Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843 (1st Cir. 1969). *See also In re J. V. Gleason Co.*, 452 F.2d 1219 (8th Cir. 1971) (trustee in bankruptcy); *United States Fidelity & Guaranty Co. v. Triborough Bridge Auth.*, 297 N.Y. 31, 74

N.E.2d 226 (1947) (federal tax lien); *O'Brien v. Fago*, 54 Misc.2d 203, 282 N.Y.S.2d 295 (Sup. Ct.1967) (judgment creditor).

**5.** *Compare In re J. V. Gleason Co.*, 452 F.2d 1219 (8th Cir. 1971) (surety entitled to priority over trustee in bankruptcy under equitable subrogation doctrine, but claims based on express assignment denied for failure to file under Uniform Commercial Code) *with United States v. Commonwealth of Pa., Dep't of Highways*, 349 F.Supp. 1370, 1383–85, 1391–93 (E.D.Pa.1972) (surety that filed UCC–1 financing statements with respect to indemnitors' assignment of all contract rights in bonded and unbonded jobs is entitled to priority as secured creditor over trustee in bankruptcy and federal tax lienor as to contract balances on unbonded jobs in addition to its subrogation rights as to bonded jobs).

three corporations and life insurance policies issued for Capous. Under the agreement, the three corporations gave Aetna control over (1) the disbursement of funds Aetna advanced, (2) payments received on bonded and unbonded jobs[6] and (3) the corporations' ability to dispose or encumber their assets. In addition to Aetna's promise to advance funds, Aetna and the Bank agreed to forbear from suit on the obligations owed them for a period of eighteen months. The security agreement, together with UCC–1 financing statements, was publicly and properly filed under the Uniform Commercial Code.[7]

It is upon the foregoing agreement and other undisputed facts that plaintiff, a general unsecured creditor of Capay and Town Hall at the time of the agreement and at the commencement of this action, grounds its charges that Aetna fraudulently "took over," "asserted control over" and "converted" the business and assets of the two companies and is therefore liable to plaintiff not only for its claim of $85,000 but also for punitive damages in the sum of $100,000. The charge is devoid of substance.

Plaintiff cites no case law to support its claim and fails even to identify the theory underlying its allegation that Aetna became liable to plaintiff as well as to other creditors of Capay and Town Hall by virtue of the security agreement.[8] It completely ignores the substantial rights accorded a surety upon the default of the principal under the doctrine of equitable subrogation, discussed above. Also disregarded is the equitable remedy of exoneration that may be imposed upon a principal even prior to payment or actual demand upon the surety for payment under its bonds.[9]

■■■ Here instead of allowing its debtors to default and asserting its rights, Aetna agreed to advance in excess of $2 million in order to enable Capay and Town Hall to complete bonded projects, as to which Aetna was secondarily liable, and unbonded projects, as to which it had no prior commitments. In turn, it obtained a valid security interest in, among other matters, contract rights of the two companies.[10] Plaintiff offers no basis for challenging the validity of this interest. The agreement was publicly filed, the consideration was fair, and there are no allegations that Capay and

6. As to bonded jobs, the Bank agreed to subordinate its claims to those of Aetna. The receipts on unbonded jobs, after deduction by Aetna for labor, material, taxes, incidental job expenses and overhead, are payable to the Bank to be applied to reduce the principal and interest on Capay and Town Hall's indebtedness to the Bank.

7. N.Y.U.C.C. § 9–401(1) (McKinney Supp.1978–1979). The agreement and financing statements were filed with the Register of the City of New York, Queens and New York Counties; the Department of State of the State of New York; the Secretary of the Commonwealth of Massachusetts; the City Clerk of Boston, Massachusetts; and the Southern Berkshire Registry of Deeds. The principal place of business of each of the three corporations is Woodside, New York; real property owned by Capous is located in Woodside, New York and Monterey, Massachusetts.

8. See State ex rel. Howard Cooper Corp. v. St. Paul Mercury Indem. Co., 288 F.2d 32, 35 (9th Cir. 1961) (surety company, which took a chattel mortgage on the contractor's property and advanced to the contractor or the bank the payments of principal and interest on conditional sales contract, did not thereby become liable to the conditional vendor for the balance of the payments); Cf. Brandes v. Pettibone Corp., 79 Misc.2d 651, 360 N.Y.S.2d 814 (Sup. Ct.1974) (N.Y.U.C.C. § 9–317).

9. Milwaukie Constr. Co. v. Glens Falls Ins. Co., 367 F.2d 964, 966–67 (9th Cir. 1966); Morley Constr. Co. v. Maryland Cas. Co., 90 F.2d 976 (8th Cir.), cert. denied, 302 U.S: 748, 58 S.Ct. 266, 82 L.Ed. 578 (1937); Chicago Title & Trust Co. v. Fox Theatres Corp., 91 F.2d 907, 910 (2d Cir. 1937); Admiral Oriental Line v. United States, 86 F.2d 201, 204 (2d Cir. 1936).

10. Under the Uniform Commercial Code, even a lien creditor would take subject to Aetna's security interest because the advances are being made "pursuant to a commitment entered into without knowledge of the lien." N.Y.U.C.C. § 9–301(4) (McKinney Supp.1978–1979). Although plaintiff obtained a judgment against Capay and Town Hall in January 1979, almost one year after the financing agreement was entered into, it is not yet a lien creditor. Knapp v. McFarland, 462 F.2d 935, 938 (2d Cir. 1972); William Iselin & Co. v. Burgess & Leigh Ltd., 52 Misc.2d 821, 276 N.Y.S.2d 659 (Sup.Ct. 1967).

**628**

Town Hall have dissolved or that they are insolvent. All that plaintiff offers are conclusory allegations based on innuendo and hearsay[11] that Aetna was in some fashion responsible for the financial distress of Capay and Town Hall which caused them to seek its aid.

 It is not unusual for either a surety or a secured creditor advancing large sums of new capital to become "intimately involved in [the debtor's] financial affairs."[12] Such involvement does not "merge" the identities of the creditor and debtor as plaintiff would have it, nor does it expose the creditor to contract liability on obligations of its debtor other than those it has agreed to assume. To the extent plaintiff's claim is premised on a theory of "piercing the corporate veil," it is not only inappropriate in this context but has been rejected in New York when the "external indicia of separate corporate identities" have been maintained.[13]

The promises made by Aetna and the Bank under the financing agreement will enable Capay and Town Hall to continue their operations, complete existing contracts and generate revenues. Such action benefits not only Aetna and the Bank but other creditors as well. If instead they had allowed these companies to be declared in default and exercised their rights as surety and secured creditor, their claims against Capay and Town Hall would be accorded priority over those of the plaintiff. In sum, plaintiff's claim is without merit and constitutes a thinly-veiled attempt to gain a preference over other creditors by suing the defendant rather than pursuing its remedies as a creditor against Capay and Town Hall.

For the foregoing reasons, summary judgment is granted to the defendant.

secured creditor conducted weekly review of outstanding accounts and current inventory); cf. *Morley Constr. Co. v. Maryland Cas. Co.,* 300 U.S. 185, 187–88, 57 S.Ct. 325, 81 L.Ed. 593 (1937) (statement of facts indicates that contractor and surety entered into supplementary agreement requiring contractor to deposit all receipts from the United States in separate account over which surety and contractor had joint control and from which no moneys could be withdrawn without the surety's consent).

---

11. The affidavit of John G. Lambros, submitted by plaintiff, is woefully lacking in meeting specific allegations set forth in the affidavit of Thomas W. Lavery, a bond claims analyst of Aetna with personal knowledge of the facts as to the basic transactions between Aetna and Capay and Town Hall. The Lambros affidavit is not made on personal knowledge and, to the contrary, is replete with such statements as "I am informed and verily believe" and "I am so informed."

12. *See Stowers v. Mahon (In re Samuels & Co.),* 526 F.2d 1238, 1256 (5th Cir.), *cert. denied,* 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976) (opinion dissenting from an en banc decision upholding security interest notes that

13. *Port Chester Elec. Constr. Corp. v. Atlas,* 40 N.Y.2d 652, 657, 389 N.Y.S.2d 327, 331, 357 N.E.2d 983 (1976).