IRWIN & LEIGHTON, INC., a
Pennsylvania corporation,
Plaintiff,

v.

W.M. ANDERSON COMPANY, a Pennsylvania corporation, Fidelity and Deposit Company of Maryland, a Maryland corporation, and Construction Management Associates, a New Jersey corporation, Defendants.

Civ. A. No. 6628.

Court of Chancery of Delaware,
New Castle County.

Submitted: Dec. 15, 1986.
Decided: Aug. 11, 1987.
Revised: Sept. 29, 1987.

Walter P. McEvilly, Jr., and Amelia L. Bland, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for plaintiff.

Josy W. Ingersoll, and Frederick W. Iobst, of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant Fidelity and Deposit Co. of Maryland.

## OPINION

ALLEN, Chancellor.

This long-pending case raises the question whether a creditor who involved itself in the management of its troubled debtor is to be held answerable for a liability of that debtor to a third person arising from a breach of contract. A number of theories are advanced in order to extend liability to this creditor: that it controlled the contracting party and, in the circumstances, should be deemed its alter ego; that it wrongfully interfered with the debtor completing its contractual obligations; and that it participated in the violation of a Delaware statute, the Contractors Trust Fund Statute, 6 *Del.C.* § 3501 *et seq.*

The troubled debtor is defendant W.M. Anderson Co. ("Anderson Co."), a Pennsylvania corporation, formerly engaged in the business of mechanical construction. The creditor who became involved in the management of Anderson Co. is defendant Fidelity and Deposit Company of Maryland ("Fidelity"), a Maryland corporation engaged in the business of acting as surety on payment and performance bonds in connection with construction projects. Plaintiff is Irwin and Leighton, Inc. ("Irwin"), a Pennsylvania corporation engaged in general contracting.

In August 1976, Irwin contracted with ICI United States ("ICI") to serve as general contractor for the construction of new laboratories and administrative offices in New Castle County, Delaware. Irwin selected Anderson Co. to be the mechanical subcontractor on the ICI job, but did not require Anderson Co. to provide a performance bond to assure satisfactory completion of its contractual obligations. Accordingly, Fidelity, which had acted as surety on performance bonds of Anderson Co. on a number of other construction projects both prior to and subsequent to the ICI project, did not provide a bond for Anderson Co. on the ICI project itself.

In December 1978, Anderson Co., which had become financially distressed, informed Irwin that it would not complete its contractual obligations on the ICI project. Irwin suffered damages as a result, and in November 1981 brought this action against Anderson Co., Fidelity, and Construction Management Associates ("CMA"), a firm employed by Fidelity to review Anderson Co.'s financial affairs and to advise Fidelity.

Pending is defendant Fidelity's motion for summary judgment.

## I.

Viewing the record in the light most favorable to the non-moving party, the plaintiff, as is required on a motion for summary judgment, *Nash v. Connell*, Del.Ch., 99 A.2d 242 (1953); *Sweetman v. Strescon Industries*, Del.Super., 389 A.2d 1319 (1978), the facts relevant to the defendant's motion appear as follows.

Anderson Co. had existed as a successful mechanical construction firm for many years when its president, James M. Anderson, Sr., died in August, 1977. His son, James M. Anderson, Jr., who had long been active in the operational side of the business but who was inexperienced in the financial aspects of the firm, succeeded his father as president. At that time, Anderson Co. was active on a number of jobs including the ICI project. Some eight months later, in April 1978, the treasurer of the company advised Mr. Anderson that the firm was experiencing financial difficulties including losses on some jobs and cash flow difficulties.

Anderson Co. then contacted its bonding company, Fidelity, and informed it of these financial difficulties. Representatives of Fidelity met on several occasions with Anderson Co.'s treasurer to discuss the situation. As a result, Mr. Anderson directed that Anderson Co. would provide Fidelity with all the information it needed with the hope that some sort of financial arrangement between Fidelity and Anderson Co. would be made that would permit Anderson Co. to work its way out of

its financial difficulty. During the early months of the summer of 1978, Anderson Co. also contacted banks in search of financial assistance but without success.

Following these meetings in the spring of 1978, with the permission of Mr. Anderson, Fidelity engaged CMA as its "expert consultant" to review the company's accounting and financial affairs. In early summer 1978, after such a review, CMA advised Fidelity that the costs for Anderson Co. to complete all bonded projects would exceed the contract balances and that Fidelity's potential loss, if Anderson Co. closed its doors at that time, approached $17,000,000. Fidelity then retained CMA for the balance of the summer of 1978 to monitor Anderson Co.'s cash flow and job cost situations and, as Fidelity's agent, to report to Fidelity. Because Mr. Anderson believed that Fidelity (and CMA) would be valuable in helping Anderson Co. to manage the firm's cash flow problem, he instructed his staff to cooperate with the CMA personnel in every way. During this second phase of CMA's involvement, its staff was situated in the center of Anderson Co.'s accounting operations. CMA's personnel became intimately involved in the day-to-day operations of Anderson Co. both in the office and at the job sites. CMA was developing within Anderson Co. its own accounting system, meeting with Mr. Anderson and other Anderson Co. staff to review and approve payments of costs and suppliers on bonded jobs, fielding telephone calls concerning payment for work on bonded jobs, and reviewing the mail before forwarding it to Anderson Co. personnel.

The severity of Anderson Co.'s financial problem became more apparent as the summer of 1978 passed; it became clear that Anderson Co. would need to recapitalize in order to complete its current jobs. An effort to obtain bank credit failed. Fidelity, with its large potential exposure, was the only possible source of financial assistance. By early November, Anderson Co. was apparently on the verge of defaulting on its various contracts. Hurried negotiations led to an arrangement permitting Fidelity to begin to extend funds to prevent default on contracts for which it had provided surety ("bonded jobs"). On November 14, 1978, Anderson Co. executed a number of agreements (the "Undertaking"). The Undertaking recited:

CONTRACTOR [Anderson Co.] is unable, for financial reasons, to continue the performance of the Bonded Contracts and to pay obligations incurred by it in connection therewith, and it believes it may be able to avoid formal defaults and termination of its activities, if SURETY will make payments pursuant to the suretyship.

The Undertaking included a joint control agreement and a trust agreement. Pursuant to these documents, receipts from bonded and unbonded jobs were to be kept completely segregated. Receipts from bonded jobs were to be expended only for the expenses on such jobs and then only with Fidelity's co-authorization. Fidelity was granted security interests in Anderson Co.'s properties and was given the right to inspect the properties and the books and records of Anderson Co. Anderson Co. retained the power to select the bills to be paid on the bonded contracts but was subject to the final approval of Fidelity. Anderson Co. was to supply a pre-signed check on the bonded jobs trust account to Fidelity to enable Fidelity to close that account unilaterally at any time.

Following signing of the Undertaking, a new procedure for payment on bonded jobs was instituted. Under it, any checks drawn, together with the invoices for which payment was to be made, were attached to a slip and forwarded to CMA personnel for approval. Then the checks with the signed slip were forwarded to Mr. Anderson for his signature. There was no such procedure for payments on unbonded jobs such as the ICI project. *See* James Anderson Dep. at 88. Anderson Co. retained complete right, *de jure* at least, to pay such claims without the consent of Fidelity but could not use revenues from bonded jobs for that purpose. Mr. Anderson was told that Fidelity was not interested in assisting in the completion of the unbonded work; "the unbonded work was to stand on its

own legs ... to be completed solely with funds paid for it." James Anderson Dep. at 145.

In December 1978, CMA representatives informed Fidelity that the costs in connection with the ICI project far exceeded contract receipts on that project. After meeting with Fidelity and CMA personnel, Mr. Anderson promptly visited with the Irwin authorities and told them that Fidelity, based on the information given by CMA, had "directed"[1] Anderson Co. to inform Irwin that they would not be able to complete the work on the ICI project, and Anderson Co. thereupon withdrew from that project leaving plaintiff to satisfy subcontractors and finish the job. *See* Plaintiff's Answers to Second Set of Interrogatories at 4.

Anderson Co. did not revive. By January 1981, Fidelity foreclosed on its security interests and mortgages and the physical plant and assets of Anderson Co. were sold. Mr. Anderson's employment was terminated in January 1981. Fidelity sustained a loss of approximately $2.5 million on its bonded Anderson Co. projects. Anderson Co. did not pay all suppliers and subcontractors connected with the ICI project. Consequently, Irwin incurred additional losses to cover those outstanding costs.

In November of 1981, Irwin filed the complaint in this action seeking an accounting for the funds paid to Anderson Co. by Irwin pursuant to the ICI contract, and seeking damages for breach of the ICI contract, including additional costs and expenses to complete performance of Anderson Co.'s remaining obligations under the ICI contract and additional costs incurred in order to pay subcontractors and suppliers not paid by Anderson Co. from monthly payments made by Irwin. The total damage claim against Anderson Co., Fidelity, and CMA is $507,066.00.

## II.

As I construe the matter, plaintiff asserts three theories to support its contention that Fidelity is liable to it. First, it asserts that Fidelity "controlled" Anderson Co. at all relevant times and that, as a consequence, it is liable for damages suffered by Irwin by reason of Anderson Co.'s breach of its contract.

Second, it asserts that even if Fidelity were not deemed to be in control of Anderson Co., it nevertheless must have known of and participated in the misapplication of Irwin's periodic payments. Since it is asserted that these diversions constituted a breach of trust by Anderson Co., it is contended that such participation renders Fidelity jointly and severally liable for that wrong.

Third, it is alleged that Fidelity is liable to plaintiff because, even if it is deemed not to have controlled Anderson Co., it nevertheless wrongfully interfered with Irwin's contractual relationship with Anderson Co., to Irwin's injury.

The pending motion is one for summary judgment as to each of these theories. Summary judgment is available "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Chancery Court Rule 56. Thus, in order for a moving party to obtain a judgment as a matter of law, that party must come forward with evidence to show that no issues of material fact are present. *Moore v. Sizemore,* Del. Supr., 405 A.2d 679, 680 (1979). Once the moving party presents facts which would entitle it to summary judgment, the non-movant has the burden of meeting those facts with contrary evidence; the defending party may not simply rely on the allegations of the complaint. *Feinberg v. Makhson,* Del.Supr., 407 A.2d 201, 203

1. Mr. Anderson uses the word "advised" in his affidavit and the word "suggested" in his deposition testimony. In the plaintiff's answers to interrogatories, Mr. Babich, then president of Irwin, testifies that Mr. Anderson told him that Fidelity "directed" Anderson Co. to breach the contract. Because plaintiff is the non-movant, I use the word "directed."

(1979); *Tanzer v. International Gen. Ind., Inc.*, Del.Ch., 402 A.2d 382, 385 (1979).

For the reasons that follow I conclude that, while the record would support a judgment in moving defendant's favor at this time on one theory advanced by plaintiff, the existence of disputed or undeveloped facts precludes such a judgment at this time on other theories advanced. The motion will, therefore, be denied. Having thoroughly considered all matters presented, I have, in the interest of judicial economy and in aid of the further litigation of this matter, set forth the matter that I regard as being now capable of legal resolution. It is to that aspect of the matter that I first turn.

## III.

### *The Control or Instrumentality Theory*

#### A.

 In asserting that Fidelity is liable for Anderson Co.'s breach of contract because Fidelity allegedly controlled Anderson Co., plaintiff necessarily encounters an elemental characteristic of the corporate form—limited liability. Ordinarily, of course, only property belonging to the corporation itself is available to satisfy obligations of the corporation. Thus, while there may be independent grounds to hold another liable for the obligations of a corporation—as an agent of the corporation or as a guarantor or surety—those in control of a corporation are not typically liable for distinctly corporate obligations by reason of that control. *Pauley Petroleum, Inc. v. Continental Oil Co.*, Del.Ch., 231 A.2d 450 (1967), *aff'd*, Del.Supr., 239 A.2d 629 (1968). This "fact," of course, supplies one of the principal utilities of the corporate form of organization.

The protection offered by the corporate form, however, is not absolute; equity has long acted to extend a corporate liability to those in control of the corporation in appropriate circumstances. The paradigm instance involves the use of a corporate form to perpetrate a fraud. In such a case equity will look behind the formalities and fix liability upon the active wrongdoer. *See Stauffer v. Standard Brands, Inc.*, Del.

Ch., 178 A.2d 311, 316 (1962), *aff'd*, Del. Supr., 187 A.2d 78 (1962); *Sonne v. Sacks*, Del.Ch., C.A. No. 4416, Brown, V.C., (June 12, 1979).

In addition, conduct short of the active intent to deceive required to establish fraud may, nevertheless, occasion the "piercing of the corporate veil," to use the standard shorthand. For example, if those in control of the corporate enterprise have not treated it as a distinct legal entity—have ignored the "corporateness" of the corporation and have themselves treated it as their "instrumentality"—courts will be less inclined to regard the corporation as an effective limitation on liability. *See Equitable Trust Company v. Gallagher*, Del. Supr., 99 A.2d 490 (1953); *Martin v. D.B. Martin Co.*, Del.Ch., 88 A. 612 (1913). Typically those in control of a corporation and those thus skewered by the lance of liability when a corporate form is disregarded in equity, are controlling shareholders; in some few instances, however, it has been acknowledged that one, other than a shareholder, who is in control of and has misused a corporate structure may be held answerable for a corporate liability. *See, e.g., Philadelphia Storage Battery Co. v. RCA*, Del.Ch., 194 A. 414 (1937) (where the possibility is acknowledged even though no disregard of the corporate entity was occasioned).

In *Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.*, 483 F.2d 1098 (5th Cir.1973), *modified*, 490 F.2d 916 (5th Cir.1974), the Fifth Circuit Court of Appeals discussed the legal standard to be applied when a creditor of a corporation seeks to hold another creditor of the corporation liable on the theory that the second creditor dominated and controlled the corporation to such an extent that it could be said to have used it as an instrumentality of its own:

[T]wo elements are essential for liability under the 'instrumentality' doctrine. First the dominant corporation must have controlled the subservient corporation and second, the dominant corporation must have proximately caused plaintiff harm through misuse of this control.

*See Berger v. Columbia Broadcasting System, Inc.,* 453 F.2d 991 (5th Cir.), *cert. denied,* 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972).

*Krivo Industrial Supply Co.,* 483 F.2d at 1103. In going on to discuss the first element of this test—the exercise of control, the *Krivo* court correctly stated: "An examination of 'instrumentality' cases involving creditor-debtor relationships demonstrates that courts require a strong showing that the creditor assumed actual, participatory, total control of the debtor. Merely taking an active part in the management of the debtor corporation does not constitute [such] control...." 483 F.2d at 1105.

The early case of *Chicago Mill and Lumber Co. v. Boatmen's Bank,* 234 F. 41 (8th Cir.1916) exemplifies the degree of involvement in the management of a financially troubled enterprise that a creditor may safely undertake without assuming liabilities of the corporation. There a bank, which had lent substantial funds to a milling company, had its assistant cashier installed as president once its debtor had fallen into default. The operating manager of the debtor testified that he took his directions from the assistant cashier or directly from the bank president. Nevertheless, the trial court refused to submit to the jury the question whether the bank had controlled the milling company for purposes of applying the instrumentality doctrine. On appeal, the Eighth Circuit affirmed, observing that "the bank was a large creditor, and as such largely interested in the prosperity of the company and most naturally should desire to keep an oversight over its doings." 234 F. at 46. The Eighth Circuit concluded that "[a]ll of the facts of this case and all of the reasonable inferences deducible from them would not, in our opinion, have warranted a jury in finding ... that the [bank] was carrying on the business of the [company] as part of its own...." *Id.*

Another illuminating opinion on the question of the degree of control a creditor may exercise without rendering itself liable for its debtors' obligations is the recent one in *McFadden v. Baltimore Contractors, Inc.,*

609 F.Supp. 1102 (E.D.Pa.1985). That action arose from a contractor's breach of contract with the subcontractor. The subcontractor sued a surety company that, while it had not issued a performance bond on the contract sued upon, had, as in this case, attempted to minimize its potential loss on bonds it had issued by involving itself very substantially in the day-to-day operations of the contractor. In that instance, the surety company required the contractor, *inter alia,* to provide it complete access to the contractor's books and records; to install a new accounting system; to authorize the surety company to give instructions to subcontractors or suppliers when, in the surety company's opinion, it was necessary to do so; to pay over to the surety all funds received on contracts for which defendant had issued a performance bond; and, with respect to unbonded jobs, to hold all funds received from such jobs separate to be applied first to paying labor and materials on unbonded jobs and indirect overhead attributable to such jobs.

On this record, the court held that no issue was presented and that the surety company was entitled to judgment as a matter of law:

> In those cases where liability has been applied under an instrumentality theory, the debtor or subservient corporation had, in reality, no separate corporate purpose from that of the creditor or dominant corporation.

*McFadden,* 609 F.Supp. at 1105. In that case, the influence that the surety company had—and clearly it had negotiated a great deal of power with respect to the management of the contractor—was held not to satisfy that test:

> Taken separately or together, the provisions of the Supplemental Agreement and the other evidence ... show that as in *Krivo,* the control exercised over Baltimore by USF & G [the surety] was nothing more than USF & G's ability to decide whether to continue extending the loan and when to demand its repayment. The Agreement [merely] put Baltimore

on notice as to which of its activities were likely to result in ... foreclosure. *McFadden,* 609 F.Supp. at 1109.

### B.

The legal test for determining when a corporate form should be ignored in equity cannot be reduced to a single formula that is neither over- nor under-inclusive. Observation of appropriate formalities by those controlling a corporation is typically regarded as an important consideration because it demonstrates that those in control of a corporation treated the corporation as a distinct entity and had a reasonable expectation that the conventional attributes of corporateness, including limited liability, would be accorded to it. *See* Douglas & Shanks, *Insulation from Liability through Subsidiary Corporations,* 39 Yale L.J. 193 (1929). When those formalities are not respected, the legal fiction of corporateness becomes less "real" in the everyday experience of those involved in the firm's operations and any expectation that others would treat it as a distinct, liability-limiting entity becomes less reasonable.

Beyond according respect for the formalities some weight, however, the cases inevitably tend to evaluate the specific facts with a standard of "fraud" or "misuse" or some other general term of reproach in mind. When the cases extending liability to a *creditor* in control of a corporation are reviewed, two generalizations emerge. First, in most of those cases, the creditor or its affiliate was active in the formation of the debtor corporation and was not simply an arms-length extender of credit. Second, in each of those instances, I have found, the corporation was from the outset operated as an arm of the creditor's (or an affiliate's) business. *See Centmont Corp. v. Marsch,* 68 F.2d 460 (1st Cir.1933); *Henderson v. Rounds & Porter Lumber Co.,* 99 F.Supp. 376 (W.D.Ark.1951); *In re Otsego Waxed Paper Co.,* 14 F.Supp. 15 (W.D.Mich.1935); *Portsmouth Cotton Oil Refining Corp. v. Fourth National Bank,*

280 F. 879 (M.D.Ala.1922), *aff'd,* 284 F. 718 (5th Cir.1922).[2]

Where, as here, the third party creditor became involved with the corporation as the result of an arms-length extension of credit or other arms-lengths transactions and thereafter comes to exercise control over the debtor by reason of a default or threatened default, such a creditor has not been held to thereby assume liability for its debtor's obligations. *See Krivo Industrial Supply Company, supra; Chicago Mill & Lumber Co. v. Boatmen's Bank, supra.* This result has specifically been reached in cases involving surety companies seeking to exercise negotiated powers to reduce exposure on performance bonds. *See James E. McFadden, Inc. v. Baltimore Contractors, Inc., supra; Dwelle–Kaiser Co. v. Aetna Casualty and Surety Co.,* N.Y.Ct.App., 241 N.Y. 464, 150 N.E. 517 (1926); *John G. Lambros Co. v. Aetna Casualty and Surety Co.,* 468 F.Supp. 624 (S.D.N.Y. 1979).

### C.

■ In this case, the record contains no basis to conclude either that Fidelity so controlled Anderson Co. at any relevant time as to justify the conclusion that equity should disregard the corporate status of Anderson Co. or that Fidelity has been guilty of any "misuse" or "fraud" or other wrong justifying holding it derivatively liable for Anderson Co.'s breach of contract. (Whether it may be held directly liable is a different question, treated below.)

A few specifics demonstrate that a separate corporate identity and purpose were maintained at least during the relevant period. The record, viewed most favorably to plaintiff, reveals that Fidelity was, at most, actively involved in the management of Anderson Co. Mr. Anderson made clear that he had the final decision on all matters prior to November 14, 1978: "Nobody ever directed me to do anything." James M. Anderson Dep. at 66. Miss Anderson's

---

2. These generalizations do not hold for *Wyoming Construction Co. v. Western Casualty and Surety Co.,* 275 F.2d 97 (10th Cir.1960), a case

which I am forced to say I believe was incorrectly decided if generally applicable corporation law concepts were to be applied.

version of the decision-making process supports this:

> Jerry Lewis [Anderson Co. treasurer] and my father sat across the table every morning with mail, and Jerry Lewis had a paper cutter. He opened every letter. As a check came in, he put it in a pile, and when they were finished opening up the mail and added up the value of those checks, then they would say, well, gee, who can we pay today. Then they took out the list of everybody that had gone to Lewis and said that these people have to be paid, and that's how they got paid. Now, this was in the middle of the summer.

Judith Anderson Dep. at 29.

Even after November 14, 1978, Mr. Anderson still retained final authority but now he *shared* with Fidelity the right of final approval on outgoing checks. The deposition testimony stresses that the role of Fidelity (through CMA) was advisory. Judith Anderson's affidavit and deposition do not contain any facts indicating total control by Fidelity or CMA. The extent of involvement of CMA, according to Miss Anderson's affidavit and deposition, included review of the mail, acceptance of telephone calls from suppliers and subcontractors in connection with jobs bonded by Fidelity, and the installation of CMA's accounting system. CMA's suggestions were followed but it seems clear that that was because Anderson Co. itself chose to do so; Fidelity seemed to offer the only source of help that might, somehow, rescue the firm.

But that great influence did not eradicate Anderson Co. as a distinct legal personality. Nor did CMA act as if it were in control. For example, Judith Anderson's affidavit states that CMA reviewed any paperwork received and that it set up its own accounting ledger into which it entered the duplicated information from the paperwork. Judith Anderson Aff. ¶ 9. The affidavit goes on to state that CMA representatives, while on the premises, would sometimes talk to a supplier on a bonded job who had not been paid and, "[a]fter taking a phone call regarding a bonded job ... would walk into the treasur-

er's office, recount his conversation, and ask the treasurer what was 'going to be done.' In contrast, CMA employees were not interested in receiving or discussing calls regarding unbonded jobs." Judith Anderson Aff. ¶ 13. Facts of this type establish rather than refute the distinct "corporateness" of Anderson Co. Fidelity is not here seen as in complete control, *de jure* or *de facto*, of Anderson Co. as a legal entity. In the first example, CMA is seen as creating its own set of records; if Anderson Co. were simply an alter ego of Fidelity, such a step would be unnecessary. In the second example, Anderson Co.'s officer is being pressed by Fidelity's agent for action, but it is a distinctive Anderson Co. that is pressed, not a charade.

Likewise, James Anderson, President of Anderson Co. who had been associated with the Company for many years before Fidelity became involved with the Company, continued to exercise the powers of his office albeit with increasingly cramped mobility, as the financial condition of the firm caused its major creditor to gain more and more leverage. "By late summer of 1978 Sugar [Fidelity's representative] and CMA personnel were meeting with me to review and approve payments to suppliers." James Anderson Aff. ¶ 14. Again, what is significant is that it here appears, not that James Anderson was simply a mask for Fidelity's interest and its control, but rather that his role was an indication of a distinct corporate enterprise, albeit one that was losing its power to control events affecting its future. And the November 14, 1978 Undertaking that gave Fidelity enhanced legal power over Anderson Co.'s internal operations was clearly a document negotiated at arms length between distinct corporate entities. *See* James Anderson Aff. ¶¶ 19–26.

Here, the corporate identity of Anderson Co. was appropriately maintained. Irwin chose to contract with this entity and elected not to protect itself by requiring a performance bond with surety. That, thereafter, Anderson Co.'s creditors came to exercise influence or even dominating practical power over Anderson Co., can, in these circumstances, provide to Irwin no

substitute for the surety bond it did not obtain.

One need hardly dilate upon the undesirable consequences, both to those seeking credit or surety initially and to those seeking to work their way out of financial distress, of a rule that forced a creditor to assume the risk of derivative liability in order to actively protect its position short of seeking judicial remedies for default.

Judgment at an appropriate time will be entered for defendants Fidelity and CMA on this claim.

## IV.

### *Participation in a Breach of Duty*

I turn now to the second theory of liability alleged in the complaint. It concerns Fidelity's alleged knowing participation in a violation of the Delaware contractor's trust fund statute. 6 *Del.C.* § 3501, *et seq.*

Chapter 35 of Title 6 of the Delaware Code provides, in effect, that moneys paid to a contractor pursuant to a contract to erect, alter or repair a structure are "trust funds" and that it is a criminal offense to fail to timely pay from such funds the lawful claims of subcontractors or suppliers of labor or materials for such structure. This Court has characterized the relationship between the payor of funds covered by this statute and the recipient of those funds as "fiduciary" in nature. *See Maull v. Stokes*, Del.Ch., 68 A.2d 200, 202 (1949).

This aspect of plaintiff's claim is predicated upon the allegation that Anderson violated Chapter 35 in failing to pay its subcontractors with funds paid by Irwin to Anderson that should have been used for that purpose. Liability for this misapplication of funds, which of course caused loss to Irwin, which was required by its contract with ICI to satisfy those claims, is sought to be extended to Fidelity on the theory that it knowingly participated in such breach of duty.

■ The tort of aiding a breach of trust has long been recognized. *See* Scott, *Participation in a Breach of Trust*, 34 Harv. L.Rev. 454 (1921). Moreover, the tort is not limited to breaches of duty by express trustees. "The principle applies to those who assist *any fiduciary* in the breach of his obligation...." Bogert, *Trusts and Trustees* § 901 at 257 (1982) (emphasis in original). The wrong has two elements: (1) an act or omission that furthers or completes a breach of trust and (2) knowledge at the time that the transaction is in breach of duty. A long series of cases has established that if a person with a claim against a trustee in his personal capacity knowingly accepts trust property in payment of that debt, the recipient takes part in the trustee's breach. *See, e.g., Dahlborg v. Middleborough Trust Co.*, 16 Mass.App. 481, 452 N.E.2d 281, 283 (1983), *aff'd*, 390 Mass. 1103, 454 N.E.2d 1276 (1983), and myriad cases cited in Bogert, *Trusts and Trustees* § 904 n. 62.

■ It is but a short step from that application of the general principle to a case of this sort, at least as plaintiff envisions it. In plaintiff's view Fidelity persuaded or coerced Anderson Co. to pay subcontractors on bonded jobs with funds from Irwin, which Fidelity or its agent, CMA, knew or should have known were intended for (and under Chapter 35 of Title 6 were required to be paid to) subcontractors on the ICI job. Thus, it would seem that if plaintiff is able to prove its allegations, it will have established Fidelity's liability to it. *See Gilbert v. El Paso Co.*, Del.Ch., 490 A.2d 1050 (1984); *Penn Mart Realty Co. v. Becker*, Del.Ch., 298 A.2d 349 (1972).

Fidelity implicitly concedes as much on this motion, but contends that it has established facts, which are uncontested in the record, that legally preclude such a result. Specifically it contends that the record is uncontradicted (1) that after the Undertaking of November 14, 1978, was signed (when Fidelity concededly acquired some degree of control over disbursements by Anderson Co.) more funds were paid out to subcontractors on the ICI job than were received by Anderson Co. and (2) that prior to that time Fidelity had no responsible role in determining who would be paid or from which funds. The affidavit of Mr. Sugar, if it alone is looked to, would tend to estab-

lish this position factually. Plaintiff has submitted affidavits of James Anderson and Judith Anderson to contradict Sugar's statements.

While the record surely does not establish either element of the tort, the record does not, on the other hand, negate either. Prior to the November, 1978 establishment of segregated accounts for receipts from bonded and unbonded jobs, all receipts went into a single account. James Anderson Aff. ¶ 18. Since CMA was recreating Anderson Co.'s accounting system by reviewing the "incoming paperwork ... on any job," Judith Anderson Aff. ¶ 9, Fidelity may have been in a position to know what receipts from the ICI job had come in. As to payments, "by late summer of 1978 [Fidelity representatives] were meeting with [James Anderson] to review and approve payments to suppliers." James Anderson Aff. ¶ 14. It is not clear what was occurring at those meetings. During that summer "management began 'grading' calls [from suppliers], instructing the treasurer to pay those suppliers who were viewed as being most essential to the continued operation of the company." Judith Anderson Aff. ¶ 11.

While the affidavits of plaintiff, even if believed, are far less than compelling, they do succeed in creating factual issues regarding the extent of CMA participation in any decisions that were made to use funds from the ICI job to pay subcontractors or suppliers on other jobs in apparent violation of Chapter 35 of Title 6. The term "participation" may have a broad meaning in this context, *see, e.g., Midgley v. Midgley,* 3 Ch.D. 282, 290 (1893), and here, as in the instance next treated in this opinion, an evaluation of the particular legal meaning of the concept "participation" in this case must await a more fully developed record. *See Keene Corp. v. Hoofe,* Del.Ch., 267 A.2d 618, 624–25 (1970), *aff'd,* Del.Supr., 276 A.2d 269 (1971).

For these reasons summary judgment will not be granted at this time on this claim.

## V.

### *Tortious Interference with Contractual Relations*

The last theory of recovery urged asserts that Fidelity caused Anderson Co. to breach its contract with Irwin; that such action constituted a wrong to Irwin and that Fidelity must be held answerable for damages that resulted. The tort of intentional interference with a contract has been widely recognized. *See Restatement of Torts (Second)* § 766 (1977); *Bowl–Mor Co., Inc. v. Brunswick Corp.,* Del.Ch., 297 A.2d 61, 64 (1972). Its elements, when stated with generality, are not controversial. There must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury. *Pennzoil Oil Co. v. Getty Oil Co.,* Del.Ch., C.A. No. 7425, slip op. at 42–43, Brown, C. (February 6, 1984); *Restatement of Torts (Second),* § 766.[3]

The critical questions in this instance are did Fidelity act so as to bring about Anderson Co.'s breach and, if so, was it justified by legitimate pursuit of its own interest in so acting? Intentional torts involving a claimed violation of a right to prospective economic advantages inevitably involve a complex normative judgment relating to justification. *Compare Restatement Torts (Second)* § 870. The normative judgment whether pursuit of self-interest justified one in inducing another to breach a contract in the particular circumstances presented inevitably involves an evaluation of many factors. Section 767 of the Second Restatement of Torts identifies the following types of consideration relevant to such a judgment.

§ 767. Factors in Determining Whether Interference is Improper

**3.** This formulation, of course, does not purport to identify liability limiting defenses. For example, in this case, it will doubtlessly be contended that, even if Fidelity wrongfully interfered, such behavior caused no loss as Anderson Co. could not and would not have completed its contract anyway in the circumstances.

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,[4]

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other.

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

The record on this motion consists chiefly of two depositions and a handful of rather short affidavits. There is a factual dispute as to just what was Fidelity's role in Anderson Co.'s decision to repudiate its contract. (*See supra* text accompanying note 1.) Without a clearer understanding of what Fidelity's role was in that decision and without a fuller understanding of the surrounding circumstances than the record now provides, it is impossible for the court to attempt to exercise a judgment concerning the justification or privilege that Fidelity may have had to act as it did. In such an instance, it is appropriate to deny summary judgment. *Keene Corp. v. Hoofe*, Del.Ch., 267 A.2d 618, 624–25 (1970), *aff'd*, Del.Supr., 276 A.2d 269 (1971); *Gottlieb v. McKee*, Del.Ch., 107 A.2d 240, 243–44 (1954).

For the foregoing reasons, defendants' motion for summary judgment will be denied.

---

4. One view of the nature of contractual obligation is that it creates alternative rights in the promisee: the right to performance or, in the absence of performance, the right to collect damages. With this view in mind some jurists have supposed that there is no legal "wrong" in exercising the indisputable legal *power* to fail or refuse to perform a contract, as that act simply converts the promisee's rights from a right to performance to a right to collect damages. This view was endorsed by Justice Holmes and was acknowledged by Chancellor Wolcott in *Philadelphia Storage Battery Co. v. R.C.A.*, Del.Ch., 194 A. 414 (1937) where he referred to the "paradox, legally but not morally true, that a party to a contract has a right to break it. If he exercises this pseudo right—this option, it might better be called—he does not destroy the contract. It continues to bind him. The law will require him to pay...." 194 A. at 429.

This view of the nature of contract is not inconsistent with the tort of wrongful interference with contract since inducing another to exercise any "right" may itself, in particular circumstances, constitute a tort (e.g., the tort of interference with prospective economic advantage) and, therefore, inducing a breach of contract, even if it is a "quasi-right," may do so as well.