# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UNICO COMMODITIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: N22C-08-436 SPL |
| | ) | |
| LOFTY LINKS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: December 6, 2024
Decided: February 25, 2025

## DECISION AND ORDER
## AFTER TRIAL

R. Karl Hill, Esq., SEITZ, VAN OGTROP & GREEN, P.A., Kevin J. Lennon, Esq., LENNON, MURPHY & PHILLIPS, LLC, *Attorneys for Plaintiff Unico Commodities, LLC*.

Neil R. Lapinski, Esq., and Madeline R. Silverman, Esq., GORDON, FOURNARIS & MAMMARELLA, P.A., *Attorneys for Defendant Lofty Links, LLC*.

**LUGG, J.**

## INTRODUCTION

In the fall of 2021, Lofty Links, LLC ("Lofty") contracted to purchase commodities from Refineria di Korsou ("RDK"). Alone, Lofty lacked the resources and funding to fulfill its obligations under the contract, so it obtained a partner to do what Lofty could not. That partner disappeared, and Lofty maneuvered to fill the void. Lofty connected with Unico Commodities, LLC ("Unico") and recast its contractual dilemma as a partnership opportunity. Lofty sought to have Unico finance and transport the commodities it – Lofty – contractually agreed to purchase from RDK. Lofty also sought to reap a return from this transaction and to forge a more lucrative partnership going forward. Alas, that did not occur.

Moving commodities – here, over 100,000 barrels of fuel – is not an easy task. Among the sundry responsibilities, ships must be chartered, insurance arranged, and approvals obtained. Compounding the complexity, the barrels subject to sale were sanctioned; the seller, RDK, acquired the fuel commodities following legal proceedings against Venezuelan entities who defaulted on obligations and simply left them behind. United States companies, of course, are keenly focused on complying with any such restrictions.

Against this backdrop, Lofty needed a partner to pay for and transport the barrels it agreed to purchase from RDK. And they needed to find a partner quickly. The initial window afforded Lofty less than a month – from November 2, 2021, to

1

November 20, 2021 – to meet the terms of the contract. Lofty convinced Unico to assist in resolving Lofty's immediate dilemma and then partnered with Unico on two subsequent commodities contracts with RDK. To extend the soon-closing window on the Lofty-RDK contract, Unico provided Lofty funds to be paid to RDK as a sign of good faith dealing. In the end, no product was lifted by Lofty or Unico from RDK under any of the contracts. Unico demanded the return of its money from Lofty, and Lofty refused. This litigation commenced.

Unico filed suit for the return of the $380,000.00 it directed to Lofty. Lofty counterclaimed seeking recovery of sums it contends it earned or which Unico, due to its failure to lift the product, prevented it from earning. Following a two-day bench trial and post-trial briefing, the Court finds the evidence supports Unico's claim for the return of its funding. The evidence does not support all but the last of Lofty's counterclaims; to the extent the evidence establishes expenditures for testing related to the Unico-Lofty venture, those expenditures are addressed in Lofty's *quantum meruit* claim. In the end, the Court directs the entry of a judgment in Unico's favor in the amount of $338,397.10 plus prejudgment interest. The Court rejects the parties' claims for attorneys' fees.

## BACKGROUND

### A.     The Parties

Unico is a limited liability company organized under Texas law.[1] Since 2019, Unico has operated as a trading company, dealing in commodities including gasoline, diesel, crude, and asphalt.[2] Riccardo Valentini ("Valentini") serves as the owner and managing member of Unico and was the sole Unico witness offered at trial.[3]

Lofty is a limited liability company organized under Delaware law.[4] Established in 2018, Lofty operates as a consultant and project manager in the petroleum industry.[5] Lofty does not trade or transport petroleum products itself; rather, it serves as an intermediary between brokers in the market.[6] Murali Iyengar ("Iyengar"), the owner and only employee of Lofty, was the sole Lofty witness presented at trial.[7]

---

[1] D.I. 28 ("Trial Tr. Day 1") at 21. This decision cites to trial exhibits ("JX #"), the trial transcript ("Trial Tr. Day __ at __"), and the Pretrial Stipulation and Order ("PTO").

[2] Trial Tr. Day 1 at 21.

[3] *Id*. at 20.

[4] *Id*. at 185.

[5] *Id*. at 258.

[6] *Id*. at 258-59.

[7] *Id*. at 185-86.

**B. Facts**

### 1. Lofty Links' Contract with RDK

On October 22, 2021, Lofty entered into a contract with RDK, a government-owned refinery located in Willemstad, Curaçao, for the purchase of 50,000 barrels of Jet Fuel and 50,000 barrels of MOGAS 95.[8] As the buyer, Lofty agreed to pay for and transport the products from Emmastad, Curaçao to a port of its choosing between October 25, 2021, and November 20, 2021;[9] but Lofty lacked the funds and resources to fulfill its responsibilities under the contract.[10] Instead, Lofty sought to position itself as a liaison to secure a buyer to take delivery of the product from RDK.[11] From the contract's inception, Lofty had neither the intention nor the capacity to nominate or charter a vessel to lift the cargo.[12]

In early November 2021, Lofty's scheduled buyers "were not able to collect or bring up the finances to take the products," leaving Lofty to find a replacement buyer to preserve its contract with RDK.[13] Lofty urgently needed to find a

---

[8] *Id*. at 32, 201, 259, 261-62; JX 23.

[9] Trial Tr. Day 1 at 259-61; JX 23 ¶¶ 5, 13, 14.

[10] Trial Tr. Day 1 at 194.

[11] *Id*. at 258-65.

[12] *Id*. at 198, 201.

[13] *Id*. at 194.

4

replacement company to pay for and take delivery of RDK's products:[14] Lofty could not fulfill the contract on its own,[15] the delivery period was rapidly approaching,[16] and RDK's U.S. Office of Foreign Assets Control ("OFAC") license – permitting the import of RDK's Venezuelan product into the United States – was set to expire on December 31, 2021.[17]

### 2. Lofty Links Connects with Unico

On November 3, 2021, Iyengar approached Unico "to see if they would be interested in picking up these products under the contract that [Lofty] had signed with RDK."[18] Iyengar telephoned and emailed Alvin Koolman, an employee of Unico,[19] to gauge Unico's interest in Lofty's contract with RDK.[20] Koolman followed that call with an email to Iyengar on November 11, 2021, summarizing the key points of the discussion.[21] Iyengar understood that, under the terms set forth in the email, Unico, due to their access to ships and funding, would assume Lofty's responsibility as the buyer under their contract with RDK. Iyengar explained, "[w]e

---

[14] *Id*. at 193-94.

[15] *Id*. at 198, 201, 211.

[16] *Id*. at 259-60.

[17] *Id*. at 37-38, 89-90, 93-94, 265-66.

[18] *Id*. at 195.

[19] *Id*.

[20] *Id*. at 266-67; JX 15.

[21] JX 13 at 3-4.

agreed that Unico will essentially step – I would like to say 'in the shoes' of Lofty to take the responsibility of the buyer under the first contract, as Unico had ships and Unico had funding available."[22]   Iyengar responded to Koolman's email on November 14, noting areas of agreement and clarifying other areas.[23]   Unico and Lofty did not reduce the terms of this email exchange to a contract, and Iyengar acknowledged, "Unico never signed any contract or written agreement for the purchase to these products that Lofty was obligated to buy from RDK."[24]

As the delivery deadline for the Lofty-RDK contract approached, Unico worked to lift the products.  On November 12, 2021, Unico submitted a required Q-88 form to the refinery, providing detailed information about the vessel scheduled to transport the products.[25]   The refinery rejected this submission.[26]   Lofty "needed a new Q-88 urgently because [they] were already on the 14th of November" and the delivery period was set to close on November 20, 2021.[27]

---

[22] Trial Tr. Day 1 at 268-69.

[23] JX 13 at 1-2.

[24] Trial Tr. Day 1 at 207.  Iyengar further explained that there was "[n]o formal written agency agreement, but the email, JX-13, was the basis in which everything was discussed and agreed."  Trial Tr. Day 1 at 226.

[25] *Id*. at 271.

[26] *Id*. at 274.

[27] *Id*. at 273.

To provide some time to effectuate this transaction, the parties agreed that Unico would make a "goodwill" payment to RDK to extend the delivery window and to preserve the contract between Lofty and RDK.[28] Because there was no direct relationship between Unico and RDK, RDK would not accept payment directly from Unico. For this reason, Unico transferred $380,000 to Lofty for distribution.[29] Of this amount, $250,000 was to be delivered by Lofty to RDK as a deposit for the purchase of the product, and $130,000 was allocated to Lofty as an advance of its anticipated fee.[30] RDK extended Lofty's delivery deadline.[31]

To comply with the United States' OFAC requirements and avoid risking sanctions, the RDK product needed to be lifted before the end of 2021.[32] On December 31, 2021, RDK informed Unico and Lofty that its OFAC license was officially extended through December 31, 2022.[33] This afforded the parties additional time to formulate and execute the various transactions.

---

[28] *Id*. at 55-56, 221, 293, 300; D.I. 36 ("Trial Tr. Day 2") at 115.

[29] Trial Tr. Day 1 at 228.

[30] *Id*. at 61, 302.

[31] *Id*. at 299.

[32] *Id.* at 37-38, 90.

[33] *Id*. at 95; JX 12.

7

### 3. *The Second Contract, the Third Contract, and the Agency Negotiations*

After the goodwill payment to RDK, Lofty, Unico, and RDK continued to develop their business relationship.[34] For any other products available for purchase, Unico agreed to contract with RDK "either directly or together jointly with Lofty."[35] In December 2021, Lofty and Unico, together jointly, entered into two additional contracts with RDK.[36] Under the second contract, Unico and Lofty agreed to purchase 200,000 barrels of High Sulphur Fuel Oils ("HSFO") and "slops" from RDK.[37] Under the third contract, Unico and Lofty agreed to purchase 420,000 barrels of crude vacuum gas oil and heavy naphtha from RDK.[38]

Unico and Lofty stood in equal footing relative to RDK in the second and third contracts, and these agreements did not account for any compensation Lofty might receive from Unico. Thus, Unico and Lofty worked to define the contours of their business relationship.[39] On January 11, 2022, Iyengar signed and sent an agency agreement to Valentini, outlining how he expected Lofty would be compensated for

---

[34] Trial Tr. Day 1 at 72-73.

[35] *Id*. at 73.

[36] *Id*. at 73-75, 77. Throughout trial, the parties referred to these as the "second" and "third" contracts and referred to the October Lofty-RDK only contract as the "first" contract.

[37] *Id*. at 73; JX 24.

[38] Trial Tr. Day 1 at 75; JX 25.

[39] JX 9-11.

securing the second and third contracts.[40] Valentini declined to countersign the agreement because "there were things that won't work for [Unico]," including the jurisdiction clause and the responsibility for bearing fees.[41]

### 4. Lofty Unilaterally Terminated the Second and Third Contracts

With the OFAC license extended for a year, and with Unico and Lofty working to fulfill their obligations, RDK extended the lifting period of all contracted products.[42] Unico continued to struggle to locate and nominate a suitable vessel to lift the products, and Lofty, as buyer on all three contracts, did not independently attempt to lift any products.[43] Ultimately, none of the products were lifted.

On January 30, 2022, Lofty, in a letter to Valentini and Koolman, "notif[ied] Unico that [Lofty is] withdrawing from the agreements, as Unico and Lofty Links have not been able to reach any agreement between each other as to the terms of the responsibilities and payment of financial fees as AGENT towards LOFTY, related to these contracts."[44] Lofty concluded by "terminating this contract."[45] Lofty

---

[40] Trial Tr. Day 2 at 28; JX 9, 10.

[41] Trial Tr. Day 2 at 22, 24; JX 54.

[42] Trial Tr. Day 1 at 299.

[43] *Id*. at 98.

[44] JX 20.

[45] *Id*.

provided a copy of its purported termination to RDK by email.[46] Lofty withdrew from the agreements because, in its view, Unico was unable to lift the products,[47] Valentini did not sign Lofty's agency agreement,[48] and Unico excluded it from communications with RDK.[49] Lofty also sought to preserve its reputation and avoid legal action from the refinery due to Unico's failure to lift the products.[50]

Following Lofty's termination letter, Unico and RDK continued to negotiate to preserve the agreements.[51] These efforts proved unsuccessful; Unico did not lift any of the product, and RDK ultimately sold the petroleum products to a third party.[52] Unico sued RDK, and RDK counterclaimed against Unico for lost profits.[53] On June 5, 2023, the Court of First Instance of Curaçao rejected both parties' claims.[54]

---

[46] JX 14.

[47] Trial Tr. Day 2 at 27, 29.

[48] *Id*. at 28.

[49] *Id*. at 28-30.

[50] *Id*. at 30.

[51] Trial Tr. Day 1 at 103; JX 22.

[52] Trial Tr. Day 1 at 107.

[53] *Id*.

[54] *Id*.; JX 55.

Unico requested Lofty return the $380,000.[55]  In April, 2022, Unico directed a formal demand letter to Lofty.[56]  Unico sought the return of this money "because it was a down payment to a deal that didn't occur."[57]  Unico learned that RDK had returned $227,000.00 of the $250,000.00 to Lofty,[58] and nothing in Lofty and RDK's contract granted Lofty the right to keep Unico's money.[59]  Lofty rejected Unico's demand.[60]  Lofty stated that it had already spent the money on various business expenses,[61] and that it considered Unico's deposit to be non-refundable "earnest money."[62]  Further, Lofty asserted that it "incurred lost profits in the amount of $1.8 million in view of Unico's failure to perform on the oil purchase contracts."[63]

---

[55] Trial Tr. Day 1 at 110.

[56] *Id*. at 109-10; JX 19.

[57] Trial Tr. Day 1 at 112.

[58] *Id*.

[59] Trial Tr. Day 2 at 63.

[60] JX 47.

[61] Trial Tr. Day 2 at 107.

[62] *Id*. at 114.

[63] JX 47.

# GENERAL LEGAL PRINCIPLES

In a civil trial, "[e]ach party bears the burden of proving its claims by a preponderance of the evidence."[64] Proof by a preponderance of the evidence means "proof that something is more likely than not."[65] "This means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes the Court believe that something is more likely true than not."[66] If the evidence presented by the parties "is inconsistent, and the opposing weight of the evidence is evenly balanced, then 'the party seeking to present a preponderance of the evidence has failed to meet its burden.'"[67] To determine which party has met its burden, the Court "may consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them."[68]

---

[64] *See, e.g.*, *Navient Sols., LLC v. BPG Office Partners XIII Iron Hill LLC*, 2023 WL 3120644, at *10 (Del. Super. Apr. 27, 2023) (internal citation omitted).

[65] *Feenix Payment Sys., LLC v. Blum*, 2024 WL 2768386, at *10 (Del. Super. Ct. May 29, 2024).

[66] *Id*.

[67] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545 (Del. Super. Ct. 2005) (quoting *Eskridge v. Voshell*, 593 A.2d 589 (TABLE), 1991 WL 78471, at *3 (Del. 1991)).

[68] *Feenix Payment Sys., LLC*, 2024 WL 2768386, at *10.

In a bench trial, the Court sits as the fact finder.[69] This role requires the Court to "assess the credibility of the witnesses and then to weigh all of the evidence presented."[70] The Court is "free to accept or reject any or all of the sworn testimony, as long as it consider[s] all of the evidence presented," just as a jury does.[71] Where the Court cannot reconcile conflicting evidence, it retains discretion to determine which evidence deserves more weight.[72]

In reaching its verdict, the Court has examined all exhibits and considered the testimony of all of the witnesses. The fact that some particular point or concept may be mentioned should not be read as any indication that the Court did not consider all evidence and legal principles applicable to this case and to the parties' claims, counterclaims, and defenses. It is difficult at times to completely segregate findings of fact from conclusions of law; to the extent any one of the Court's factual findings might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point. The Court has considered Delaware caselaw defining the legal precepts applicable to the claims and defenses

---

[69] *See, e.g.*, *Torres v. Bishop*, 2021 WL 6053870, at *4 (Del. Super. Ct. Dec. 21, 2021) (citing *Pencander Associated, LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *2 (Del. Super. Ct. June 30, 2010)).

[70] *Mundy v. Devon*, 906 A.2d 750, 755 (Del. 2006).

[71] *Pardo v. State*, 160 A.3d 1136, 1150 (Del. 2017).

[72] *Torres*, 2021 WL 6053870, at *4.

offered by the parties. The Court applied the Delaware Rules of Evidence to the testimony and exhibits and, in its deliberation, has relied only upon that which would be admissible under those rules. And the Court has considered each party's arguments on their respective theory of the case and any weight to be assigned to testimony or evidence.

## ANALYSIS

Unico seeks to recover the $380,000 it paid Lofty. To do so, Unico asserts claims of unjust enrichment, assumpsit, and declaratory judgment.[73] To justify its retention of Unico's funding, Lofty alleges Unico committed tortious interference with contract, fraudulent misrepresentation, breaches of contracts, breach of the implied covenant of good faith and fair dealing, and seeks recovery based on *quantum meruit*.[74] The Court addresses each party's claims in turn.

As an initial matter, the enforceability of the negotiated contracts must be addressed. Lofty alone, and together with Unico, entered into three contracts with RDK. By the terms of these agreements, any "controversy or claim relating to [the] agreement or the breach thereof shall be settled by the courts of Curaçao" and "all matters related to the validity, interpretation or performance of [the] contract shall be governed by the laws of Curaçao."[75] Although these agreements provide some context to the dispute presently before this Court, nothing in this decision should be construed to address the validity of any terms. As for the terms' validity, "a valid

---

[73] D.I. 1 ("Compl.") ¶¶ 14, 19, 26.

[74] D.I. 6 ("Def. Ans.") ¶¶ 42, 50, 53, 58, 60, 64, 66.

[75] JX 23 at ¶¶ 19, 20; JX 24 at ¶¶ 19, 20; JX 25 at ¶¶ 19, 20.

15

forum selection clause must be enforced," and, in accordance with the contracts' forum selection clauses, this Court defers to the courts and laws of Curaçao.[76]

At its core, this case involves the dispute between Unico and Lofty over a failed agency relationship. As explained below, neither the emails surrounding the Lofty-RDK contract, nor the subsequent discussions of an agency agreement, formed enforceable contracts between Lofty and Unico. As a result, Lofty must return to Unico the money Unico: (1) provided to Lofty to send to RDK as a sign of good faith; and (2) advanced Lofty on projected earnings that never came to fruition.

## A.    Unico's Claims

### 1.    Unjust enrichment

Unico contends the $380,000 sent to, and retained by, Lofty unjustly enriched Lofty at Unico's expense, and therefore, Unico is entitled to recover this sum.[77] Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[78] An unjust enrichment claim may be

---

[76] *See Nat'l Indus. Grp. (Holding) v. Carlyle Inv. Mgmt. LLC.*, 67 A.3d 373 (Del. 2013).

[77] Compl. ¶ 14.

[78] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (quoting 66 Am. Jur. 2d, *Restitution and Implied Contracts* §3, p. 945 (1973)).

brought "as a standalone claim or as a remedy for other claims."[79] To sustain a claim for unjust enrichment, the plaintiff must establish: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[80] An unjust enrichment claim cannot be made where the parties' relationship is "comprehensively governed by a contract."[81] The Superior Court may award damages for unjust enrichment "when it cannot hold the parties to a formal agreement but determines that the aggrieved party is entitled to relief for a benefit conferred on the other party."[82]

Unico entered the Lofty-RDK dealings in the eleventh hour at Lofty's request and attempted to assist Lofty in fulfilling its obligations under the contract. Unico assumed no contractual responsibility to either Lofty or RDK. And, while Unico and Lofty engaged in negotiations aimed at formalizing their relationship, those terms were never reduced to a mutually agreed upon contract. In the midst of discussions between the three parties, Unico provided Lofty $380,000. Because no

---

[79] *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 390 (Del. 2023).

[80] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[81] *Chumash Capital Investments, LLC v. Grand Mesa Partners, LLC*, 2024 WL 1554184, at *14 (Del. Super. Ct. Apr. 10, 2024).

[82] *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).

contract governed this payment, this Court may entertain Unico's unjust enrichment claim.[83]

Unico must show a "direct relationship between [Lofty's] enrichment and [Unico's] impoverishment," and that Unico's impoverishment was for Lofty's benefit.[84] There is no question that Unico provided Lofty $380,000.[85] Valentini testified, consistent with Lofty's own invoice, that the purpose of the $380,000 payment was two-fold.[86] First, $250,000 was to be provided to RDK as a sign of good faith to maintain the Lofty-RDK contract past the original delivery date.[87] Second, the remaining $130,000 represented an advance to Lofty for Lofty's anticipated fee upon the completion of the first contract.[88] The Court finds that Unico's impoverishment, benefitted Lofty.

Lofty argues that Unico should not recover based on unjust enrichment because Unico "received the benefit of its bargain" in the form of a deadline

---

[83] *State ex rel. Jennings*, 299 A.3d at 391.

[84] *CoreTel Am., Inc. v. Oak Point Partners, LLC*, 2022 WL 2903104, at *11 (Del. Super. Ct. July 21, 2022) (cleaned up) (quoting *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59-60 (Del. Ch. 2012)).

[85] D.I. 19 ("Joint Stip.") at 3.

[86] Trial Tr. Day 1 at 60-61.

[87] *Id*.

[88] *Id*.; JX 21.

extension.[89]  But the evidence does not support this argument.  When it became clear to RDK that the products subject to the Lofty-RDK contract would not be lifted, RDK returned substantially all of the good faith deposit.  And, of course, because the Lofty-RDK contract was never completed, Lofty earned no fee.  Unico received no benefit of any bargain; when dealings collapsed, Lofty held Unico's money without justification.  The evidence supports Unico's unjust enrichment claim.

### 2.    *Assumpsit*

As a fallback to secure the money it provided Lofty, Unico asserts a claim of assumpsit.[90]  "[W]henever one person has in his hands money equitably belonging to another, that other person may recover it by assumpsit for money had and received.  The remedy at law is adequate and complete."[91]  Unico's assumpsit claim is "quite similar" to its unjust enrichment claim.[92]  In fact, unjust enrichment, as a common law claim, developed from the principles underlying assumpsit.[93]  But, "assumpsit cannot be maintained on a transaction from which no contract can be

---

[89] D.I. 35 ("Def. Ans. Br.") 3-4.

[90] Compl. ¶ 22.

[91] *Gaines v. Miller*, 111 U.S. 395, 397-98 (1884) (internal citations omitted).

[92] D.I. 32 ("Pl. Op. Br.") 19.

[93] *Garfield on behalf of ODP Corporation v. Allen*, 277 A.3d 296, 347-48 (Del. Ct. Ch. 2022).

implied."[94] Thus, if there exists no contract, express or implied, an assumpsit claim must fail. Unico has the closely related remedy at law – unjust enrichment – that affords it complete relief, and Unico has met its burden in proving that claim. In the absence of a contract, the evidence does not support Unico's assumpsit claim.

### 3. *Declaratory Judgment.*

As a final backstop, Unico seeks a declaratory judgment ordering Lofty to return the $380,000.[95] Superior Court Civil Rule 57 provides, "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."[96] The Court possesses discretion to issue a declaratory judgment so long as the action presents an "actual controversy."[97] For an "actual controversy" to exist, four elements must be satisfied:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be

---

[94] *Hutton v. Wetherald*, 1848 WL 802, at *1 (Del. Super. Ct. Apr. 1, 1848); *Knowles v. Massey*, 81 A. 470, 471 (Del. Super. Ct. 1908) ("In order to support [an] action of assumpsit, it is incumbent on the plaintiff to show from a preponderance of the evidence that there was a contract, express or implied in law between him and the defendant.").

[95] Compl. ¶¶ 24-26.

[96] Super. Ct. Civ. R. 57.

[97] *XL Specialty Ins. Co. v. WMI Liquidating Trust*, 93 A.2d 1208, 1216 (Del. 2014).

between parties whose interests are real and adverse; and (4) the issue involved in the controversy must be ripe for judicial determination.[98]

Although evidence exists to satisfy each of these four elements, "[w]here a plaintiff seeks a declaratory judgment, it must show that, absent a favorable outcome in the litigation, the defendant's wrongful conduct will go unchecked."[99] An action for declaratory judgment is precluded "where the defendant ceased engaging in the contested conduct before the complaint was filed unless the plaintiff can prove a real and immediate risk of future injury."[100] Unico does not meet that burden here. Unico does not allege, nor do the facts support, the existence of a future harm. Instead, Unico argues "it is entitled to a declaratory judgment that it is entitled to return of all funds remitted to Lofty."[101] The Court declines to enter a declaratory judgment on these facts.

---

[98] *In re COVID-Related Restrictions on Religious Services*, 326 A.3d 626, 642-43 (Del. 2024) (quoting *Rollins Int'l v. Int'l Hydronics Corp.*, 303 A.2d 660, 662-63 (Del. 1973)).

[99] *Employers Ins. Co. of Wausau v. First State Orthopaedics, P.A.*, 312 A.3d 597, 613 (Del. 2024).

[100] *Id*. at 613-14.

[101] Pl. Op. Br. 21.

## B. Lofty's Claims

### 1. *Tortious Interference*

Lofty contends Unico's failure to take delivery of the products under the first agreement constituted an intentional act that caused Lofty to breach its contract with RDK.[102] To prevail on a claim for tortious interference with contract under Delaware law, the plaintiff must show, "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[103] When tortious interference with contract is alleged against a corporate defendant, the plaintiff must show the corporate defendant "was not pursuing in good faith the legitimate profit seeking activities of [its] affiliated enterprise []" that was a party to the contract.[104] Further, there can be no tortious interference with contract unless the defendant "sought maliciously or in bad faith to injure plaintiff."[105]

The evidence does not establish that Unico acted maliciously or in bad faith to cause a breach of Lofty's contract with RDK. Unico was not a party to the First

---

[102] Def. Ans. ¶¶ 42-44.

[103] *Bhole, Inc. v. Shore Inv., Inc.*, 67 A.3d 444, 453 (Del. 2013) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)).

[104] *Id.*

[105] *Id.*

22

Contract.[106]  The question is not simply whether Unico's failure to take delivery constituted an "intentional act that [was] a significant factor in causing the breach."[107]  Instead, the Court must assess whether Unico, with malice or bad faith, affirmatively acted to prevent Lofty from performing its obligations under the First Contract.[108]  It did not.

Lofty drafted Unico to do what it, Lofty, could not – pay for and transport commodities.  Despite efforts to do so, Unico failed to charter an accepted vessel to fulfill Lofty's obligation to RDK.[109]  Unico worked to secure a ship and funded a good faith payment to RDK to extend the window to take delivery of the product on Lofty's behalf.  Unico's failure to take delivery does not represent a malicious effort to injure Lofty.  Without Unico, or another capable buyer and transporter, Lofty could not fulfill its negotiated agreement.  And Lofty had no intention of paying for or lifting the products.  Unico's failed attempt to save Lofty does not constitute intentional interference.

---

[106] Def. Ans. ¶ 41.

[107] Def. Ans. Br. 10.

[108] *See Bhole, Inc.*, 67 A.3d at 453.

[109] D.I. 34 ("Pl. Ans. Br.") 20; D.I. 31 ("Def. Op. Br.") 22.

## 2. *Breach of Contract – First Contract*

Lofty contends Unico breached a contract they formed through the parties' email exchanges.[110] To prove this claim, Lofty must establish: "(1) the existence of a contractual obligation, (2) a breach of that obligation, and (3) damages resulting from the breach."[111] Under Delaware law, contracts are construed objectively, meaning how they would be understood by an "objective, reasonable third party."[112]

It is axiomatic that, for there to be a breach of contract, there must first be a valid contract. A valid and enforceable contract exists when: "(1) the parties intended that the instrument would bind them, demonstrated at least in part by its inclusion of all material terms; (2) those terms are sufficiently definite; and (3) the putative agreement is supported by legal consideration."[113] The "overt manifestation of assent – not subjective intent – controls the formation of a contract."[114] To determine whether the parties intended to be bound, the Court considers the parties' communications preceding the execution of a signed agreement.[115] A signed writing

---

[110] Def. Op. Br. 10-17.

[111] *Active Day OH, Inc. v. Wehr*, 2024 WL 3201167, at *3 (Del. Super. Ct. June 27, 2024).

[112] *Zenith Energy Terminals Joliet Holdings LLC v. CenterPoint Props. Tr.*, 2023 WL 615997, at *9 (Del. Super. Ct. Jan. 23, 2023).

[113] *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018).

[114] *Id.*

[115] *Id.*

"generally offers the most powerful and persuasive evidence of the parties' intent to be bound."[116] No such writing exists here. The Court must determine whether the communications between Lofty and Unico objectively manifested their mutual intent to be bound by terms proffered in the parties' email exchanges. They do not.

The email exchange establishes that neither Unico nor Lofty intended to be bound by the terms of those communications. Twenty-first century communication – here, email – provides an efficient negotiating platform, but the acquired efficiency does not dispense with the requirement that, fundamentally, a contract must be premised upon a meeting of the minds. That did not occur. Unico emailed Lofty with what it defined as a "synopsis" of the two parties' phone call.[117] Unico conveyed an outline of discussions with Lofty and concluded by requesting that Lofty "advise [Unico] if there are any other points of importance" that must be addressed.[118]

Lofty's response evidences its contemplation or negotiation of an agreement and not its intent to be legally bound by the email exchanges. Lofty began its email by recognizing Unico's "interest" in a sale contract.[119] The email, a marked up

---

[116] *Id.*

[117] JX 13.

[118] *Id.*

[119] *Id.*

version of Unico's communication, summarized the ongoing negotiations.[120]  Lofty annotated Unico's "synopsis," and added terms, such as a proposed pricing formula, absent from Unico's email.[121]  Lofty concluded by inquiring whether "there is any more information that will be required," and committed to "send the contract soon."[122]  Lofty's writings reflect its understanding that neither party was yet bound by the terms discussed in the email exchanges.  The evidence fails to establish a contractual relationship between Unico and Lofty.  Without a contract, there can be no breach.

### 3. *Fraudulent Misrepresentation.*

Lofty, in its fraudulent misrepresentation claim, asserts that Unico misrepresented its ability to lift the products during the delivery period.[123]  This misrepresentation, Lofty contends, resulted in Lofty's injury.[124]  To support this claim, Lofty must prove:

> (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's

---

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] Def. Ans. ¶ 53.

[124] *Id.* ¶ 54.

action or inaction taken in justifiable reliance upon the representation; and (5) damages to the plaintiff as a result of such reliance.[125]

The evidence does not support this claim. Lofty argues "Unico knew all along that it would not lift the product because it did not have a proper vessel."[126] But there is a difference between failing to fulfill a promise despite efforts to do so, and fraudulent misrepresentation. To support a claim of fraudulent misrepresentation Lofty must establish that Unico knew or believed its representation was false.[127] No record evidence supports the finding that Unico "knew all along" it did not have a proper vessel.[128] Rather, Unico tried and failed to save Lofty (as to the first contract) and fulfill their joint commitment to RDK (as to the second and third contracts).

Lofty contractually bound itself to RDK under the First Contract before bringing Unico into the transaction.[129] It follows that paying for and lifting the products were Lofty's contractual obligations alone. Yet Lofty did nothing to nominate a vessel to lift the products.[130] Unico is not to blame for Lofty's failure to meet its contractual obligations, and no evidence supports this claim. Because Lofty

---

[125] *Gillespie v. Carper*, 2024 WL 4709937, at *2 (Del. Super. Ct. Nov. 7, 2024) (quoting *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000)).

[126] Def. Ans. Br. 10.

[127] *Gillespie*, 2024 WL 4709937, at *2 (citing *Lord*, 748 A.2d at 402).

[128] Def. Ans. Br. 10.

[129] Pl. Op. Br. 27.

[130] Trial Tr. Day 1 at 98, 198.

27

fails to offer factual support that Unico knowingly made false representations, Lofty's claim for fraudulent misrepresentation fails.

### 4. Breach of Contract – Second and Third Contracts

Lofty contends "Unico's failure to lift the products identified in the Second Contract and Third Contract caused Lofty Links and Unico to breach those agreements."[131] As noted above, to establish the breach of contract claim, Lofty must prove, "(1) the existence of a contractual obligation, (2) a breach of that obligation, and (3) damages resulting from the breach."[132] Unico and Lofty stood as partners on the Second and Third Contracts, and thus were equally responsible for the contractual obligations.[133] Iyengar admitted that Lofty relied on Unico to charter a vessel, but nothing in the Second or Third Contract placed this responsibility solely on Unico.[134] To be sure, Lofty made no effort to obtain a vessel on its own.[135]

Further, the Court finds that, though Unico and Lofty contemplated an agency relationship, no formal relationship was formed. With no Agency Agreement, there is no support for Lofty's contention that Unico's failure to secure a vessel "put Lofty

---

[131] Def. Op. Br. 24.

[132] *See, e.g.*, *Active Day OH, Inc.*, 2024 WL 3201167, at *3.

[133] JX 24; JX 25; Pl. Op. Br. 28; Def. Op. Br. 24.

[134] Trial Tr. Day 1 at 247.

[135] *Id*. at 248.

Links at risk of breaching [its agreements with RDK]."[136] Lofty and Unico's contractual responsibilities in relation to the Second and Third Contract were concomitant and owed by both to RDK. Thus, both Lofty and Unico were at risk of breaching the second and third contracts for their failure to lift the product. Lofty contends it terminated the agreements with RDK "pursuant to its duty to mitigate its damages."[137] But it was RDK – not Lofty – who stood to be injured as a result of Unico and Lofty's breach. Damages are assessed in contract-based claims "to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed."[138] And, as noted above, this Court is not the forum for enforcing the Second or Third Contracts. The evidence does not establish Unico breached any express or implied obligation to Lofty.

### 5. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Lofty contends that Unico breached the implied covenant of good faith and fair dealing because it excluded Lofty while "attempting to negotiate separate contracts with RDK NV."[139] The implied covenant of good faith and fair dealing is "a limited and extraordinary remedy" that only rectifies events that "could not

---

[136] Def. Ans. Br. 12.

[137] *Id.*

[138] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009).

[139] Def. Ans. ¶ 60.

reasonably have been anticipated at the time the parties contracted."[140] To succeed on its claim that Unico breached the implied covenant, Lofty "must allege a specific obligation implied in the contract, a breach of that obligation, and resulting damages."[141] The Court may imply contract terms only when there exist allegations that the other party's unreasonable or arbitrary conduct "frustrat[ed] the fruits of the bargain that the asserting party reasonably expected."[142] In evaluating whether conduct was unreasonable or arbitrary, the Court must consider the parties' reasonable expectations at the time the contract was written, and avoid rewriting the contract to appease the party who believes they got a bad deal.[143]

The claim fails from the start. The evidence does not support the existence of a contract between Lofty and Unico. In the absence of a contract, no specific unwritten term may be implied.[144] Nonetheless, without any contractual basis to do so, after Lofty withdrew from the second and third contracts, Unico assured RDK that Lofty would receive a benefit if the products were lifted.[145] There is no basis to impose this limited and extraordinary remedy.

---

[140] *Beyond Risk Topco Holdings, L.P. v. Chandler*, 2024 WL 4369239, at \*19 (Del. Super. Ct. Sept. 24, 2024) (internal citations omitted).

[141] *Id.*

[142] *Nemec*, 991 A.2d at 1126.

[143] *Nemec*, 991 A.2d at 1126.

[144] *Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 357 (Del. 2020).

[145] Trial Tr. Day 2 at 66; JX 22 at 5.

### 6. Breach of Contract – Agency Agreement

Lofty contends the evidence "reflects the parties' intent to be bound" by the negotiated terms in the Agency Agreement, and "[t]he Agency Agreement is, therefore, a valid and enforceable contract."[146] As explained, a breach of contract claim requires that a valid and enforceable contract exist between the parties.[147]

Here, Unico did not express an intent to be bound by the proposed Agency Agreement. Valentini testified that when Lofty sent a copy with its signature on it, content within the proposed Agency Agreement "was never even discussed."[148] From Unico's perspective, "[Lofty] just prepared the documents, signed it, and sent it to [Unico] without even giving [Unico] the opportunity to review [the proposed Agency Agreement.]"[149] Valentini's testimony is supported by his response to the proposal. When Iyengar forwarded the proposed Agency Agreement to Unico on January 11, 2022, Unico indicated that certain provisions "won't work for [Unico]" and that "[Lofty] made changes [Unico] didn't agree on," such as law and costs.[150] Iyengar testified that Lofty and Unico "never had any discussions" about the Agency

---

[146] Def. Op. Br. 19-20.

[147] *See, e.g.*, *Active Day OH, Inc.*, 2024 WL 3201167, at *3.

[148] Trial Tr. Day 1 at 80.

[149] *Id.*

[150] *Id.* at 22; JX 54.

Agreement after this response.[151] When asked if he knew that "an agency agreement had not been finalized and signed with Unico," Iyengar answered, "that's correct."[152]

Iyengar explained that he did not mention the Agency Agreement in Lofty's January 30, 2022, termination letter because "Unico never signed the agreement, any of those agreements. Neither the purchase agreement, nor the Agency Agreement."[153] Iyengar may have subjectively believed that the emails represented an Agency Agreement, but an objective assessment does not reveal a legally enforceable contract arising from the electronic communications. Again, in the absence of an executed contract – the Agency Agreement – Lofty's breach of contract claim fails. And, because there was no contract, Lofty's assumpsit claim also fails.[154]

### 7. *Quantum Meruit*

Lofty contends that because the Agency Agreement "states that Unico will compensate Lofty Links, as its agent, by paying it a commission," Lofty is entitled to damages in the form of *quantum meruit*.[155] *Quantum meruit* is a "quasi-contract

---

[151] Trial Tr. Day 2 at 96.

[152] *Id*. at 93.

[153] *Id*.

[154] *Hutton*, 1848 WL 802, at *1 (holding that a claim for assumpsit "cannot be maintained on a transaction from which no contract can be implied.").

[155] Def. Op. Br. 28.

claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid."[156]   A quasi-contract is "one where the law will infer the existence of a contractual relationship without regard to the actual intention of the parties where circumstances are such that justice warrants a recovery as though there had been a promise or contract."[157]

Here, the Court cannot infer the existence of a contractual relationship based on the proposed Agency Agreement.  Certainly, Lofty expected to be paid.  But recovery based on *quantum meruit* is a two-pronged test.[158]  Lofty's expectation of payment does not by itself warrant recovery in the form of *quantum meruit*; it must be shown that Unico should have known, based on the Agency Agreement, Lofty expected to be paid.[159]  The evidence does not show this.

Rather, the evidence establishes that, for the first contract, Lofty would not reap a benefit until the product was resold for a price at, near, or above the Platts

---

[156] *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004).

[157] *LCT Capital, LLC v. NGL Energy Partners LP*, 2022 WL 17851423, at *4 (Del. Super. Ct. Dec. 22, 2022).

[158] *See Petrosky*, 859 A.2d at 79.

[159] *See Petrosky*, 859 A.2d at 79.

33

Quote. By assuming a position "in the shoes"[160] of Lofty, Unico agreed to pay for and lift the product Lofty contracted to buy from RDK. Curiously, Lofty attempted to conceal its negotiated price to increase its earnings,[161] but it is unclear how Lofty expected to complete the transaction without revealing this price to Unico. Of course, Lofty eventually revealed the full terms of its contract with RDK.[162] But, the fact remains that a discount on a purchase does not directly translate into an earned profit. Based upon the evidence offered at trial, to profit on the brokering of commodities, Lofty would need to resell the product at a price greater than its purchase price. Put simply, a discount does not equate to profit. And, as evidenced by the difficulty in lifting these products, the Court cannot conclude that a subsequent sale near, at, or above the Platts quote would necessarily occur. The evidence established that this is an industry where earnings are seen in the margins. And here, no margin was ever realized.

A different, equally straightforward, assessment guides the Court to reject Lofty's *quantum meruit* claim as to the second and third contracts. As an initial matter, the evidence revealed Lofty did little more than introduce Unico to RDK. And that introduction, and the revelation that RDK possessed more commodities for

---

[160] Trial Tr. Day 1 at 268-69.

[161] *Id*. at 63.

[162] *Id*.

sale, was effectively completed when Unico agreed to attempt to save Lofty's first failing contract. Nonetheless, Unico committed to compensate Lofty upon the delivery of the commodities subject to the second and third contracts. But, of course, the products were never delivered. Absent delivery, Lofty can sustain no claim under the theory of *quantum meruit*.

The evidence is insufficient to support a *quantum meruit* claim for work Lofty alleges it performed to sustain the three contracts. Without further explanation, Lofty contends it "spent Unico's money while trying to pitch [the] products to other third parties,"[163] inspections, consultants, travel, "and those kinds of things we had to do."[164] Lofty offered no evidence of discrete expenditures or tasks performed in furtherance of the First, Second, or Third contracts. Nor is there evidence that Unico should have known that it would be responsible for any of these fees.

There is evidence of expenditures on behalf of Unico and Lofty for lab testing of products subject to the various contracts.[165] To the extent these services fall within "inspections" or "those kinds of things [Lofty] had to do," the Court will consider them here as part of Lofty's *quantum meruit* claim. Valentini

---

[163] Trial Tr. Day 2 at 107-108.

[164] Trial Tr. Day 1 at 302-303.

[165] JX 35, 36. Unico objected to the admission of these documents at trial and the parties agreed to address their admissibility in post-trial briefing. The Court finds that a sufficient foundation has been offered and the exhibits are, thus, admitted.

acknowledged that a sum was paid for testing and expressed his understanding that the cost of that testing accounts for the difference between the $250,000 paid to RDK and the $227,000 RDK returned to Lofty.[166] Further, Lofty asserts that it used Unico's funding to pay the second invoice.[167] The Court finds that the evidence supports Lofty's payment of these invoices – $23,807.00 and $17,795.90. These expenses have been paid from the money Unico provided Lofty; because Lofty prevails on this claim, the result is that Lofty is not required to reimburse Unico for $41,602.90 of the $380,000.00.

## C.     Attorneys Fees

Both Unico and Lofty have requested the award of attorneys fees and costs. Delaware follows the American Rule which provides that each side pays its own attorneys' fees and costs.[168] "Aside from express statutory authorization, Delaware recognizes only a limited number of exceptions to the American Rule.[169] The Court does not find the evidence supports any recognized exception to the American Rule, thus, neither party is awarded attorneys' fees or costs.

---

[166] Trial Tr. Day 1 at 129.

[167] Trial Tr. Day 1 at 311.

[168] *In re Delaware Public Schools Litigation*, 312 A.3d 703, 715-16 (Del. 2024).

[169] *Id.* at 716.

## CONCLUSION

Lofty's ambition exceeded its capacity to perform. Unico came to Lofty's aid and endeavored to support Lofty through its first contract and partner with Lofty on subsequent contracts. The business plan involved rapidly "flipping" a substantial quantity of internationally sanctioned commodities. With the benefit of hindsight, it may appear obvious that this arrangement was doomed to fail. But Lofty may not retain the money put forth by Unico to, for a time, keep the venture afloat. Lofty shall return to Unico $338,397.10 plus prejudgment interest.

**IT IS SO ORDERED**

_____
Sean P. Lugg, Judge